2015 IL App (1st) 131180
Nos. 1-13-1180 & 1-13-1229 (cons.)
Opinion filed September 8, 2015
Modified Upon Denial of Rehearing filed February 2, 2016

Second Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 98 CR 30521 & 99 CR 25668 |
| | ) | |
| GERARDO GARCIA, | ) | The Honorable |
| | ) | Rickey Jones, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Presiding Justice Mason and Justice Pucinski concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Gerardo Garcia, appeals from the dismissal of his third stage postconviction petition, contending the trial court erred when, after a retrospective fitness hearing, it found him fit to stand trial for first-degree murder and to plead guilty to unlawful use of a weapon by a felon. Garcia further contends the trial court erred in failing to advance his ineffective assistance of counsel claim past second stage proceedings. He argued that his trial counsel should not have stipulated to the State's factual basis and allowed him to plead guilty to the felony weapons offense.

¶ 2    The trial court's dismissal of Garcia's postconviction petition following a third stage evidentiary hearing was not manifestly erroneous. The State offered credible evidence in the form of both defense counsels' testimony and a psychiatrist's report finding Garcia fit to stand trial in the murder case and that he made his plea in the felony weapons case knowingly and intelligently.

¶ 3    Regarding Garcia's challenge to the second stage dismissal of his ineffective assistance of counsel claim, the parties dispute whether we may consider the merits. Contrary to the State's contention that we lack jurisdiction to consider Garcia's ineffective assistance claim because he did not include it in his notice of appeal, we find review of the issue proper where the only possible way for him to appeal the second stage dismissal was by filing a timely notice of appeal after the remainder of his postconviction petition was denied after the third stage hearing. Having done so, Garcia properly appealed the second stage dismissal, a step in the procedural progression leading to the final judgment. Taking all well-pled facts as true, the trial court properly dismissed Garcia's ineffective assistance of counsel claim during the second stage proceedings finding he failed to make a substantial showing that trial counsel provided ineffective assistance of counsel in stipulating to the State's factual basis, which supported a finding of guilt on the felony offense.

¶ 4                                    BACKGROUND

¶ 5                                  Procedural History

¶ 6    In 1998, the State charged Garcia with two counts of unlawful use of a weapon by a felon (UUWF) and two counts of simple unlawful use of a weapon (UUW) in case No. 98 CR 30521. The following year, the weapon charges still pending, the State charged Garcia in case No. 99

CR 25668 with first-degree murder, attempted first-degree murder, and aggravated battery after Garcia brought a gun to a fist fight.

¶ 7                                Mental Health History

¶ 8          On December 5, 2000, while in custody awaiting the murder trial, Garcia was admitted to Cermak Hospital and placed in full leather restraints for four hours after he threatened to commit suicide by hanging himself or cutting his wrists. Garcia reported he wanted to kill himself because his case appeared to be going "bad," and because he was facing 20 to 40 years in prison if found guilty. Garcia also reported he felt stress due to his incarceration, the possible outcome of the case, worry for his one-year-old daughter, and his ex-girlfriend's pregnancy by another man. Doctors prescribed multiple medications to treat anxiety and depression (Zoloft, Trazodone and Lorazepam a/k/a Ativan). Lorazepam is a sedative when administered intramuscularly rather than orally. The hospital discharged Garcia the following day, but he remained on psychotropic medication while in Cook County jail.

¶ 9          On April 2, 2001, Garcia was taken to the Cermak emergency room following an attempted suicide by cutting his ankles and trying to overdose on medication, his own and that of fellow inmates. In May 2001, Garcia began taking an additional prescription antidepressant with a sedative function, Doxepin a/k/a Sinequan.

¶ 10          On June 29, 2001, following a bench trial, the court found Garcia guilty of first-degree murder and aggravated battery. Garcia did not testify. When questioned by the court about his decision, Garcia answered "Yes," "No," and "No, I don't want to testify."

¶ 11          The following month, on July 19, Garcia again was taken to Cermak emergency room. There a psychiatrist considered him at high risk of attempting suicide because he had planned ways to kill himself. That evening, the acute care unit admitted Garcia, who exhibited depression

and mental confusion. The next day, a psychologist noted Garcia displayed "limited insight, judgment & impulse control." The acute care unit discharged Garcia two days later.

¶ 12    On August 19, 2001, Garcia went to Cermak Hospital for exhibiting acute depression, mental confusion and psychotic symptoms, including auditory hallucinations and paranoid ideation. He reported he had been fine until taken off medication on account of stomach pain. Garcia resumed taking his medication and was discharged the next day.

¶ 13    On September 11, 2001, the night before his sentencing hearing on the first-degree murder conviction, Garcia was taken to the emergency room and placed in restraints "for the protection of self and others" after fighting with another inmate. He remained in the restraints overnight for 16 hours. He received the sedative Lorazepam (Ativan) intramuscularly at 5:55 p.m. "in order to achieve sedation and control."

¶ 14    The next day, after returning from his sentencing hearing on his first degree murder conviction and his guilty plea hearing, Garcia was observed being socially withdrawn and resting in his room. On September 13 and 14, 2001, Garcia was calm, alert, and quietly resting.

¶ 15                          Sentencing and Plea Hearing

¶ 16    On September 12, 2001, the court held Garcia's sentencing hearing on his murder conviction. During mitigation, defense counsel informed the court, "since my client has been in custody for this, he has been put into the [Psych] Ward because of the suicide attempt, and he is on medication for that." Counsel requested Garcia receive a sentence "much closer to the minimum than the maximum." The trial court asked whether the medication counsel referred to was psychotropic; counsel responded, "No, it is not, your Honor, it is an anti-depressant." The court replied, "Thank you. Likewise, I certainly could see nothing but that Mr. Garcia is anything other than competent. He certainly has conducted himself in an appropriate manner through these

proceedings." Defense counsel stated, "I agree, your Honor." In allocution, Garcia stated he was sorry, "I was not meaning to kill nobody, you know. And I want you to have mercy in dealing with me in court."

¶ 17    The trial court sentenced Garcia to 28 years' imprisonment for first-degree murder and to a concurrent term of 6 years for aggravated battery with a firearm.

¶ 18    The same day, Garcia pled guilty to UUWF in the weapons case (98 CR 30521), in exchange for two years' imprisonment to run consecutively to his earlier 28-year sentence. During the plea hearing, the court admonished Garcia of his rights and he answered appropriately all questions, including those concerning his decision to plead guilty, his right to a trial by jury, and whether he wished to waive the presentence investigation. Garcia replied with one-word answers of "yes."

¶ 19    The State put forth a factual basis for Garcia's guilty plea. Relevant for this appeal is the State's contention that Garcia admitted to police officers that his car was at the location of the arrest and that he had a gun in it. The officer recovered from Garcia's car a .25-caliber semiautomatic blue steel pistol loaded with four live rounds. Defense counsel stipulated to the evidence and the court found Garcia guilty of UUWF. Asked whether he wished to say anything before sentencing, Garcia replied, "No." The court sentenced Garcia to two years in prison on count I, which alleged that he possessed a firearm "on or about his person."

¶ 20    Following the hearing, Garcia returned to Cermak Hospital where he remained for two days before being taken back to the jail.

¶ 21                                    Direct Appeal

¶ 22    On appeal from his murder conviction, Garcia argued the State failed to prove him guilty beyond a reasonable doubt because he was acting in self defense of a friend when he shot and

killed the murder victim and shot the other victim. Alternatively, Garcia argued his first-degree murder conviction should be reduced to second-degree murder because he unreasonably believed the circumstances justified his use of deadly force in defense of another. This court affirmed Garcia's murder conviction on direct appeal. *People v. Garcia*, 343 Ill. App. 3d 1286 (2003) (unpublished order under Supreme Court Rule 23). Garcia did not seek to withdraw his guilty plea or appeal his weapons conviction.

¶ 23                                    Postconviction Proceedings

¶ 24        On March 3, 2004, 2 1/2 years after his plea in the weapons case, Garcia filed an untimely *pro se* motion to withdraw his guilty plea, citing his mental health condition, medication, and treatment at Cermak Hospital. The court denied his motion. Garcia did not appeal.

¶ 25        On September 15, 2004, Garcia filed a *pro se* postconviction petition in the weapons case raising issues regarding his fitness to stand trial, his decision to plead guilty and his sentencing. Garcia argued the combination of medications he was taking at the time of his guilty plea rendered him "totally lethargic and unable to assist in his defense or make any rational decisions." Garcia also alleged his trial counsel was ineffective for failing to inform the court of his "irrational behavior/demeanor and the fact that he was on psychotropic drugs." He further alleged ineffectiveness of counsel for failing to object to the State's "inadequate" factual basis for his UUWF conviction in that no firearm was found on his person, he did not admit to being in possession of a firearm, and a firearm was found in his parked car.

¶ 26        On November 30, 2004, Garcia filed a postconviction petition contesting his first-degree murder conviction, the details of which are not relevant to this decision.

¶ 27    The court appointed counsel and advanced Garcia's postconviction petitions for second stage consideration. On August 26, 2009, Garcia, through counsel, filed a single supplemental petition addressing both cases. He alleged he was unfit to stand trial, plead guilty, or be sentenced, citing his multiple suicide attempts and regime of psychotropic medications. Garcia also alleged ineffective assistance for trial counsel's failure to investigate this issue, which led to counsel misrepresenting Garcia's mental health to the court. In support of his supplemental petition, Garcia attached his medical records, the presentence investigative report, transcripts from 2001, and affidavits from his mother and sister highlighting changes in his behavior and cognitive abilities during his incarceration. Counsel also attached the report of Dr. James Corcoran, a board-certified forensic psychiatrist and the medical director of Chicago Reed Mental Health Center. Dr. Corcoran opined, "Mr. Garcia was unfit to stand trial and unfit to plead guilty" and that he would have been "unable to assist his attorney in his defense." Dr. Corcoran concluded that Garcia was too sedated to assist defense counsel, despite his ability to understand the proceedings. Dr. Corcoran noted Garcia's condition worsened over time with the increase in the number of psychotropic medications prescribed, resulting in disorganized thinking that made complex thought and communication "very difficult."

¶ 28    The court granted the State's motion to dismiss Garcia's postconviction petition on all grounds for relief, except fitness, and advanced Garcia's postconviction petition to third stage proceedings on his fitness at the time of trial. The court ordered a BCX (behavior clinical examination). The issue of fitness was not raised at trial.

¶ 29                        Behavior Clinical Examination

¶ 30    In September 2010, Dr. Monica Argumedo, a psychiatrist with forensic clinical services conducted Garcia's BCX. Dr. Argumedo evaluated Garcia with respect to his fitness at the time

of his murder trial in 2001 and at the time he pled guilty to UUWF. Before her interview, Dr. Argumedo reviewed the fitness evaluation conducted by Dr. Corcoran on June 15, 2008; the July 30, 2001, investigative report from the adult probation department; the affidavits of Garcia's mother and sister; the transcripts of the court proceedings from September 12, 2001 (sentencing and plea hearings); the Chicago police department arrest investigative records; and the August 2010 records from Cermak Hospital. Three months after meeting with Garcia, Argumedo received and reviewed the records from the Department of Corrections and Cermak Hospital for December 2000 and December 2001. On March 2, 2011, Dr. Argumedo informed the court by letter of her opinion—Garcia was fit to stand trial and plead guilty in 2001.

¶ 31                        Retrospective Fitness Hearing

¶ 32        During the retrospective hearing, which took place over several dates in 2012, the defense called Dr. Corcoran, as well as Garcia's mother and sister. The State called Dr. Argumedo and Garcia's two trial attorneys, Michael Clancy and David Pielet.

¶ 33        Dr. Corcoran testified that during his retrospective fitness evaluation, he relied primarily on his review of Garcia's medical records, but also interviewed Garcia for 90 minutes and reviewed the trial transcripts, reports concerning Garcia's mental health, and his family members' affidavits. Corcoran opined that at the time of the trial and the guilty plea, Garcia was unfit and too sedated to assist defense counsel even though he was able to understand the proceedings. Corcoran believed Garcia's mental condition worsened over time due to the number of psychotropic medications he was prescribed, resulting in disorganized thinking. Corcoran noted that Garcia's statements in response to the court's questioning during the trial proceedings did not prove fitness. Corcoran considered it significant that Garcia did not testify and the court did not ask complex questions calling for a narrative response.

¶ 34    Dr. Corcoran stood by his opinion even though he was aware that in November 2001, shortly after Garcia's sentencing and guilty plea, Garcia went through the intake process at jail and admitted he lied about trying to kill himself in an attempt to get moved to protective custody. Corcoran explained the effects of the Ativan which Garcia received intramuscularly on September 11, 2001, as possibly including sedation, passivity, tiredness, and sometimes inability to focus. Dr. Corcoran testified that the combined effect of all of the psychotropic medications and Garcia's depression could result in a behavior that would appear "under control" and "appropriate" by a lay person. Corcoran opined Garcia did not have the ability to assist or cooperate with his trial attorneys as he would have difficulty forming thoughts "in a coherent manner due to extensive sedation of the medications."

¶ 35    Garcia's mother and sister testified they regularly visited him in Cook County jail while he awaited trial. Initially, Garcia appeared his normal, sociable self, but over time, he began acting distracted like "his mind wasn't there." Garcia's family members explained that he would only offer one-word answers to questions, often gave nonresponsive answers, and would repeat things he had already told them.

¶ 36    Dr. Argumedo testified she met with Garcia in 2010 and also reviewed Dr. Corcoran's report, other reports, the family affidavits, Cermak records, and the court transcript from September 12, 2001 (the sentencing hearing). Dr. Argumedo testified that Garcia understood the court process in 2001 and in 2010, and that he was not experiencing any psychotic symptoms. She explained that in reaching her opinion, her main concern was with the incident involving restraints the night before his sentencing/plea hearing. She testified she wanted to know the reason for the restraints and what type of treatment he received. When she reviewed the records, she concluded that Garcia "was very upset, particularly about instances in his case." When

questioned, "Meaning what?" Argumedo explained, "Meaning when he was convicted, he reacted by becoming very depressed, having suicidal thoughts, saying, 'I just want to die. I don't want to die in jail,' and it seemed to me that it sort of supported my opinion that he understood what was going on because when this occurred, he understood the significance of them." Argumedo testified that during Garcia's trial, the times he reported suicidal thoughts "were almost always in direct relation to something that was happening within his case, his case wasn't going well, he was looking at a lot of time, and so he was worried, and so he would get depressed to the point where he would want to kill himself, or he would attack another inmate, something would happen along those lines, and it seemed like it fit a pattern." In terms of fitness, Argumedo found the fact that Garcia's depression correlated with how well his case seemed to be going indicated "a good understanding of what was going on in the trial."

¶ 37       Dr. Argumedo reviewed Garcia's medication and their side effects. That Garcia experienced abdominal discomfort while taking Zoloft and reported the side effect to a doctor, who changed the medication, indicated to Dr. Argumedo that Garcia had the "ability to be appropriately self-protective." Argumedo opined that had Garcia experienced side effects such as mental confusion, inability to concentrate or deadening of emotions, she would have expected him to report those feelings as he did his depression and stomach discomfort. The absence of any reports like that was significant to Argumedo.

¶ 38       Argumedo testified specifically about the events surrounding Garcia's time in restraints on September 11, 2001. According to the records, Garcia hit another inmate with a food tray and the altercation occurred. He was brought to Cermak Hospital and placed in restraints because he was "physically fighting them." Argumedo testified the records show Garcia received a two milligram dose of Ativan, which she described as "a starting dose or on the smaller end of a

dose, to calm him down." After receiving the Ativan, Garcia was still agitated, but was "clear," "alert and oriented." Garcia was saying, "I had to take care of my business." The records state he slept through the night. Argumedo stated that Garcia "didn't seem overly sedated." When questioned whether Garcia returned to the general population the next day, Argumedo replied, "It looked like the next day, but I'm not a hundred percent positive." (Garcia remained at Cermak Hospital for two more days after the sentencing/plea hearing.)

¶ 39    Dr. Argumedo conceded defense counsel was wrong when he informed the court Garcia was not taking any psychotropic medications and that an individual taking these types of medications could be fit one day and unfit the next.

¶ 40    Garcia's trial attorney, Michael Clancy, testified that he and David Peilet represented Garcia in his murder trial. They consulted with him at the jail in 1999 or 2000 to discuss the facts of the case and potential trial strategies. Clancy met with Garcia over 20 times during the course of the case and Garcia told him his story and was "absolutely" able to assist in his defense. Clancy recalled that Garcia was "very involved" in explaining the circumstances of the shooting to his attorneys and the facts the defense presented at trial came from Garcia's recollection.

¶ 41    Peilet testified Garcia assisted in his defense and that he and Clancy were able to formulate their trial strategy through communications with Garcia. In the past Peilet had represented clients for whom he requested fitness hearings due to doubt about their fitness, but he never had a doubt about Garcia's fitness. The issue of Garcia's fitness "never entered his mind" because Garcia was able to "intelligently discuss with him, and he was able to articulate certain specific facts that were needed in preparation of the defense." According to Peilet, at no time during trial, sentencing, or plea hearing was Garcia unable to assist in his own defense.

¶ 42        Both attorneys testified Garcia always seemed appropriate and acted "compliant and cooperative" during all court dates and, therefore, they never doubted his fitness. The attorneys acknowledged they had no psychology training or familiarity with psychotropic medications. They also admitted they did not review Garcia's records from Cermak Hospital and only learned about his attempted suicide from April 2001 and other mental health issues when they received the presentence investigative report just before sentencing in the murder case.

¶ 43        At the conclusion of the evidence, Garcia's postconviction counsel argued Dr. Argumedo performed the wrong analysis in determining Garcia's fitness. Postconviction counsel argued Argumedo improperly focused on the standard set forth in the insanity statutes and Garcia's ability to understand the proceedings. Counsel argued Argumedo failed to analyze whether Garcia was able to assist his trial attorneys at all relevant times, and pointed to the trial attorneys' lack of psychological training. Counsel argued that their interpretation of Garcia as fit because of his calm and compliant state actually shows that Garcia was "highly sedated."

¶ 44        The court denied Garcia's supplemental postconviction petition, finding Garcia was fit at all relevant times during the proceedings. The court found the testimony of the State's witnesses more credible than that of the defense witnesses.

¶ 45        Garcia appeals, contending that the trial court erred in finding him fit, where the undisputed record shows he spent the night before he pled guilty and was sentenced in full restraints and under the effects of sedatives.

¶ 46                            ANALYSIS

¶ 47        The Illinois Post-Conviction Hearing Act provides a process by which a criminal defendant may challenge his or her conviction. 725 ILCS 5/122-1 *et seq.* (West 2010). A postconviction action is a collateral attack on a prior conviction and sentence, "not a substitute

for, or an addendum to, direct appeal." *People v. Kokoraleis,* 159 Ill. 2d 325, 328 (1994). To be accorded relief under the Act, a defendant must show there was a substantial deprivation of his or her constitutional rights in the proceedings that produced the conviction. *People v. Pendleton,* 223 Ill. 2d 458, 471 (2006). The Act "provides for postconviction proceedings that may consist of as many as three stages." *Id.* at 472. At the third stage, the trial court hears evidence and determines whether, based on that evidence, the defendant is entitled to relief. *People v. Chatman*, 357 Ill. App. 3d 695, 698 (2005). "[T]he post-conviction trial judge is able to observe and hear the witnesses at the evidentiary hearing and, therefore, occupies a 'position of advantage in a search for the truth' which 'is infinitely superior to that of a tribunal where the sole guide is the printed record.' " *People v. Coleman*, 183 Ill. 2d 366, 384 (1998) (quoting *Johnson v. Fulkerson*, 12 Ill. 2d 69, 75 (1957)). Accordingly, when the circuit court holds an evidentiary hearing to consider new evidence and weigh witness credibility, the court's judgment will not be disturbed absent manifest error. *People v. Morgan*, 212 Ill. 2d 148, 155 (2004). "Manifest error is error which is ' "clearly evident, plain, and indisputable." ' " *Id.* (quoting *People v. Johnson*, 206 Ill. 2d 348, 360 (2002), quoting *People v. Ruiz*, 177 Ill. 2d 368, 384-85 (1997)).

¶ 48    The trial court ordered a third stage evidentiary hearing on the issue of Garcia's fitness to stand trial for first-degree murder and to plead guilty to UUWF. Following the hearing, the trial court found Garcia retrospectively fit for both.

¶ 49                                        Garcia's Fitness

¶ 50    Garcia contends the trial court erred in dismissing his postconviction petition following the third stage evidentiary hearing. Garcia claims he could not assist in his defense at sentencing and pled guilty as a consequence of his use of psychotropic medications and his mental state, including psychotic episodes and attempted suicide.

¶ 51    The due process clause of the fourteenth amendment prohibits the conviction and sentencing of a defendant who is not fit to stand trial. U.S. Const., amend. XIV; *People v. Johnson*, 206 Ill. 2d 348, 361 (2002). Illinois law presumes a defendant fit to stand trial and considers a defendant unfit only if his or her mental condition prevents him or her from understanding the nature and purpose of the proceedings or assisting in the defense. 725 ILCS 5/104-11(a) (West 2010); *People v. Shum*, 207 Ill. 2d 47, 57 (2003). When a *bona fide* doubt concerning a defendant's fitness to stand trial exists, the court must order a fitness hearing to resolve the question of fitness before the case can proceed further. 725 ILCS 5/104-11(a) (West 2010); *Johnson*, 206 Ill. 2d at 361. The well-settled test for fitness necessitates that a defendant have "sufficient present ability to consult with his [or her] lawyer with a reasonable degree of rational understanding … [and] a rational as well as factual understanding of the proceedings against him [or her]." (Internal quotation marks omitted.) *People v. Stahl,* 2014 IL 115804, ¶ 24 (quoting *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996), quoting *Dusky v. United States,* 362 U.S. 402, 402 (1960) (*per curium*)). A fitness examination order is not evidence of a *bona fide* doubt as to the defendant's fitness. *People v. Hill*, 345 Ill. App. 3d 620, 627 (2003) ("decision to appoint an expert to examine a defendant has no bearing on the court's ultimate conclusion as to whether a *bona fide* doubt as to the defendant's fitness to stand trial has been raised"). Once a *bona fide* doubt has been raised as to the defendant's fitness to stand trial, the State must prove the defendant fit by a preponderance of the evidence. *People v. Clay*, 361 Ill. App. 3d 310, 331 (2005).

¶ 52    Fitness and mental illness differ: fitness is a legal term determined by a judge or jury; mental illness is diagnosed by a licensed physician or psychologist. *People v. Tuduj*, 2014 IL App (1st) 092536, ¶ 89. "Fitness speaks only to a person's ability to function within the context

of a trial. It does not refer to sanity or competence in other areas. A defendant can be fit for trial although his or her mind may be otherwise unsound." *People v. Easley*, 192 Ill. 2d 307, 320 (2000). Evidence at a fitness hearing may include a report from forensic clinical services, or from private psychiatrists or psychologists retained by either side, but the court must make the ultimate decision as to the defendant's fitness, not the experts. *People v. Bilyew*, 73 Ill. 2d 294, 302 (1978). Courts determine fitness by considering "the defendant's irrational behavior, the defendant's demeanor at trial, and any prior medical opinion on the defendant's competence" to stand trial. *People v. Harris*, 206 Ill. 2d 293, 304 (2002).

¶ 53       Garcia contends that "[u]nder no circumstances should a defendant be deemed fit at the time he was committed to the pscyh ward at Cermak Hospital." He maintains that his trial attorneys and the judge were not aware of the full scope of his mental health treatment (his psychotropic medication and night in full leather restraints),  so "they presumed he was fit" at the sentencing/plea hearing. Garcia asks that we reverse and "make it clear that it is illegal to engage in an important criminal proceeding while the defendant is *** heavily medicated and [in] a suicidal ward of a mental hospital."

¶ 54        But the issue before the trial court did not involve whether Garcia was mentally ill or required psychotropic medication; the issue before the trial court was whether Garcia could understand the nature of the proceedings against him and cooperate with counsel in his defense during the murder trial, and at the time he was sentenced and pled guilty to UUWF. See *Easley,* 192 Ill. 2d at 322-23. Following the fitness hearing, the trial court determined that during the trial and at the time of Garcia's sentencing, and when he pled guilty to the weapons offense, there were no facts in existence which raised a real, substantial, and legitimate doubt as to his mental capacity to understand the nature and purpose of the proceedings against him and meaningfully

participate. We will uphold the trial court's ruling unless manifestly erroneous. See *Morgan*, 212 Ill. 2d at 155.

¶ 55     A defendant's fitness depends on whether the defendant "has sufficient present ability to consult with his [or her] lawyer with a reasonable degree of rational understanding—and whether he [or she] has a rational as well as a factual understanding of the proceedings against him [or her]." *Dusky*, 362 U.S. at 402. The same test applies to fitness hearings conducted retrospectively. See *People v. Mitchell*, 189 Ill. 2d 312, 339 (2000).

¶ 56     The record indicates that Garcia's mental health began deteriorating in late 2000, when he was admitted to Cermak Hospital for the first time after threatening suicide. Garcia continued to experience mental health episodes, including one the night before his sentencing hearing and guilty plea. On September 11, 2001, he was taken to the emergency room and placed in restraints overnight. He also received the sedative Ativan intramuscularly.

¶ 57     On September 12, 2001, Garcia attended the sentencing hearing and pled guilty to UUWF. He listened as the court admonished him of his rights and answered all of the court's questions appropriately, albeit with one word responses of "Yes" and "No." There is nothing atypical or suspect about a defendant's one-word response during a plea hearing. Indeed, the purpose of the hearing is to confirm or disprove defendant's understanding of the rights he or she is giving up by pleading guilty. Thus, we attach no particular significance to the fact that the court's questions did not call for narrative answers. Garcia declined the opportunity to speak before sentencing on his guilty plea, but did make a statement in allocution during the sentencing hearing for his first-degree murder conviction. Garcia stated he was sorry, "I was not meaning to kill nobody, you know. And I want you to have mercy in dealing with me in court."

¶ 58    Dr. Argumedo testified Garcia was fit to stand trial. She found his depression, suicidal thoughts, and anxiety to be situational and only triggered when he believed his trial was going poorly. Dr. Corcoran offered conflicting testimony, finding Garcia unfit based primarily on his mental condition worsening over time, along with an increase in the number of psychotropic medications he was prescribed, resulting in disorganized thinking. The court credited Argumedo's testimony over Corcoran's. As a reviewing court, it is not for us to disregard the credibility determinations of the trial court. See *People v. Houseworth*, 388 Ill. App. 3d 37, 52 (2008) (where there is conflicting expert testimony, trial court, as trier of fact, determines which expert to consider more credible).

¶ 59    Garcia's defense attorneys both testified he cooperated with them throughout the trial, participated in formulating their defense strategy, and that they had no *bona fide* doubt concerning his fitness at any time during their representation. Garcia argues his trial counsel "seriously underestimated the gravity of the situation" when he responded to the court's question incorrectly by stating that Garcia was not under the influence of psychotropic medications when he was. At the time of the retrospective fitness hearing, the trial court was aware the medication Garcia was taking was psychotropic and, as our supreme court has observed, the use of psychotropic medication is not equivalent to a *bona fide* doubt of a defendant's fitness. See *People v. Mitchell*, 189 Ill. 2d 312, 338-89 (2000). Further, any weight the trial court gave defense counsels' testimony regarding Garcia's fitness was not manifestly erroneous. See *People v. Eddmonds,* 143 Ill. 2d 501, 518 (1991) ("The representations of defendant's counsel concerning the competence of his client, while not conclusive, are another important factor to consider." (citing *Drope v. Missouri,* 420 U.S. 162, 177 n. 13 (1975)).

¶ 60 The trial court observed Garcia's demeanor throughout the proceedings and held no concerns about his ability to understand the proceedings or participate with his attorneys in his own defense. The trial court credited the State's witnesses over that of the defense on the issue of Garcia's fitness and concluded that Garcia had been fit to stand trial and plead guilty. The trial court's conclusion—that there is nothing in the record to indicate Garcia was confused, lacked understanding, or could not assist in his own defense as a result of the medication he was taking during his murder trial or sentencing/guilty plea on September 12, 2001—is not manifestly erroneous. Accordingly, the trial court properly denied Garcia postconviction relief following the third stage evidentiary hearing.

¶ 61 Ineffective Assistance of Counsel Claim

¶ 62 Garcia argues his counsel's stipulation to the State's insufficient factual basis for the weapons charge, UUWF, and his counsel's consequent advice to plead guilty to that unproven offense deprived him of his constitutional right to effective assistance of counsel.

¶ 63 Garcia argues he made a substantial showing that trial counsel was ineffective for failing to object to the sufficiency of the factual basis for his guilty plea. He contends the factual basis did not establish he "possessed a firearm 'on or about his person,' " an essential element of the UUWF charges. Garcia argues it is significant that he was charged with two counts of UUWF and two counts of simple UUW and that both counts of UUWF and one count of UUW alleged he carried the firearm "on or about his person" and the other count of UUW alleged the firearm was "in a vehicle." Garcia further contends the factual basis only supported a conviction for UUW, not UUWF, to which he pled guilty. Garcia argues his counsel should have objected to the factual basis as inadequate to prove the enhanced offense and should have prevented him from pleading guilty. Because of counsel's "deficient representation," Garcia contends his

conviction and sentence involved a more serious offense than the State could prove. Garcia argues he sufficiently alleged this claim in his postconviction petition and the trial court erred when it dismissed the claim at the second stage, advancing only his fitness contentions to third stage proceedings.

¶ 64　　　The trial court dismissed Garcia's postconviction petition at the second stage, finding he failed to make a "substantial showing of a constitutional violation." *People v. Edwards,* 197 Ill. 2d 239, 246 (2001). During second stage review, unless the record affirmatively refutes the petitioner's allegations, they are taken as true, and the question becomes whether the allegations establish a constitutional violation. *People v. Coleman,* 183 Ill. 2d 366, 380 (1998). Meaning, if proven at a third stage evidentiary hearing, the petitioner would be entitled to relief. *Id*. We review a second stage dismissal *de novo. Id*. at 389.

¶ 65　　　Before proceeding to the merits, however, we must address our jurisdiction. As an appellate court, we have a duty to consider jurisdiction and dismiss an appeal if jurisdiction is wanting. See generally *In re M.W.,* 232 Ill. 2d 408, 414-15 (2009).

¶ 66　　　The State contends we lack jurisdiction to consider the merits of Garcia's ineffective assistance of counsel claim. The State maintains Garcia failed to raise this claim in his notice of appeal by only referencing the trial court's denial of his postconviction claim following the third stage evidentiary hearing on March 28, 2013. The State contends Garcia affirmatively chose to only appeal the third stage fitness issue, not the entire judgment as he alleges. The State argues there is no procedural relation between the third stage fitness issue and the second stage ineffective assistance claim and, therefore, even liberal construction of Garcia's notice of appeal cannot vest this court with jurisdiction to hear his claim. We disagree.

¶ 67        Garcia's notice of appeal specified the appeal was being taken from the trial court's order of March 28, 2013, "Post-Conviction Petition denied after Stage III hearing." As the State acknowledges, Garcia could not appeal the July 27, 2010, ruling dismissing his ineffective assistance claim at the second stage until after there was a final and appealable judgment, and that meant waiting for the outcome of the third stage hearing on March 28, 2013.  The rules for post-conviction proceedings do not provide for interlocutory appeals, so Garcia had to wait until the "final judgment" disposing of the entire petition. See Ill. Sup. Ct. R. 651 (addressing appeals "from a final judgment of the circuit court in any post-conviction proceeding" and stating they abide by "the rules governing criminal appeals, as near as may be").

¶ 68        Our supreme court has explained that an appeal from a final judgment includes every previous ruling that represents a "step in the procedural progression leading to the judgment specified" and every "preliminary determination necessary to ultimate relief." *Burtell v. First Charter Serv. Corp.*, 76 Ill. 2d 427, 435-36 (1979). See also, *In re Isaiah D.*, 2015 IL App (1st) 143507, ¶¶ 21-22 (listing only date of final judgment sufficient as "there is nothing in the applicable rules of our supreme court suggesting that the notice of appeal must contain further specificity").

¶ 69        The July 27, 2010, order partially dismissing Garcia's petition and advancing it for a third stage hearing only on the fitness issue was both a step in the procedural progression of his case and a preliminary determination necessary to reach the final judgment. The July ruling cannot be separated from the later ruling on Garcia's fitness claim and, therefore, the notice of appeal must be interpreted to include both rulings. Nevertheless, when a postconviction petition raises several claims having distinct factual bases and that were not resolved in one hearing, the better practice would be to specify all of the orders resolving the distinct claims in the notice of appeal. Garcia's

notice of appeal correctly identified the date and nature of the final judgment, "Post-Conviction Petition denied after Stage III Hearing;" "March 28, 2013" and, therefore, we can and must address the merits of Garcia's ineffective assistance argument.

¶ 70 Garcia was charged with two counts of UUWF and two counts of UUW. Both UUWF and one of the UUW counts alleged he carried a firearm "on or about his person." The other UUW count alleged the firearm was "in a vehicle." Garcia agreed to plead guilty to a single count of UUWF in exchange for a two-year sentence.

¶ 71 Defense counsel stipulated to the State's factual basis in support of the guilty plea. The factual basis included that Garcia told police that his parked car contained a gun. The officers searched the car and recovered a .25-caliber pistol. The court found Garcia guilty of UUWF.

¶ 72 The factual basis as presented supports the charge that Garcia possessed a firearm after being previously convicted of a felony, the only two essential elements of the offense of UUWF. 720 ILCS 5/24–1.1(a) (West 2000). "Knowing possession" can be either actual or constructive. *People v. Brown,* 327 Ill. App. 3d 816, 824 (2002). Because Garcia was not found in actual possession of the firearm, the State had to prove that he constructively possessed it. See *People v. McCarter,* 339 Ill. App. 3d 876, 879 (2003). The State established Garcia constructively possessed the firearm by showing he had "knowledge of the presence of the weapon" (he informed the police of its existence and location) and that he "exercised immediate and exclusive control over the area where the weapon was found" (it was found in his car on the floor of the passenger side). *Id.;* See generally *People v. Davis,* 408 Ill. App. 3d 747 (2011) (defendant convicted of UUWF after backpack of guns found in his car).

¶ 73 Based on this factual record, Garcia was proven guilty of UUWF. The parties properly stipulated to the only two essential elements of a charge of UUWF: knowing possession of the

.25-caliber gun and a prior felony under Case No. 97 CF 4450010. Accordingly, Garcia failed to make a substantial showing his trial counsel should have objected to the factual basis as inadequate and prevented Garcia from pleading guilty. Garcia failed to make a substantial showing of both prongs of a meritorious ineffective assistance claim. See *Strickland v. Washington*, 466 U.S. 668 (1984) (criminal defendant's constitutional right to effective assistance infringed if counsel's performance unreasonable and prejudiced defendant).

¶ 74　　　　The trial court properly dismissed the claim at the second stage.

¶ 75　　　　Affirmed.