2025 IL App (1st) 240051-U

No. 1-24-0051

Order filed July 18, 2025

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondent-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 05 CR 17324 |
| | ) | |
| SHAUN GIBSON, | ) | Honorable |
| | ) | Maria Kuriakos-Ciesel, |
| Petitioner-Appellant. | ) | Judge presiding. |
| | ) | |

JUSTICE NAVARRO delivered the judgment of the court.
Presiding Justice Mikva and Justice Oden Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm the circuit court's dismissal of petitioner's *pro se* postconviction petition where petitioner failed to state the gist of a constitutional claim that he did not knowingly or voluntarily plead guilty to first degree murder.

¶ 2    Petitioner, Shaun Gibson, appeals from the circuit court's order summarily dismissing his *pro se* postconviction petition. Gibson contends that his petition set forth a non-frivolous constitutional claim that he was mentally incapable of knowingly and voluntarily pleading guilty

to first degree murder, and therefore his petition should be advanced to second-stage proceedings under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)). For the following reasons, we affirm.

¶ 3                                       I. BACKGROUND

¶ 4      Gibson was arrested on July 4, 2005, in connection with the stabbing death of his mother the day the before. At Gibson's arraignment on August 8, 2005, he pled not guilty to first degree murder. On January 18, 2006, defense counsel told the court, "[w]e're going to have [Gibson] evaluated." On April 24, 2006, defense counsel told the court that Gibson was scheduled to see the defense's expert on June 3, 2006. On June 7, 2006, defense counsel told the court that Gibson had been seen by a doctor and that "[w]e subpoenaed more records and he is going to make another visit, and we should have another evaluation."

¶ 5      On October 3, 2006, defense counsel told the court that his expert recommended getting an MRI of Gibson's head "to rule out him having a tumor in his head." The following colloquy then occurred:

> "STATE: Just for the record, we have been dealing with this defendant's alleged
> sanity issue since February of this year. We are waiting for [a] sanity report. I have
> not gotten one. Then he was supposed to see defense expert on May 3rd and then
> June the doctor said he needs to see him again. Now, we have gotten dates since
> June for it. We are waiting for [the] sanity report.
>
> DEFENSE COUNSEL: We are not waiting for sanity report. This is for his defense.
>
> STATE: I thought your expert was looking at him for sanity.
>
> COURT: Motion defendant, 11/13.

STATE: Was he ever found unfit?

DEFENSE COUNSEL: No."

¶ 6    On November 13, 2006, defense counsel advised the court that "my doctor is evaluating him. We're trying to get an MRI."

¶ 7                              A. Guilty Plea Proceedings

¶ 8    On April 23, 2007, defense counsel stated that the State had offered Gibson 28 years in prison and Gibson wanted to accept that offer. The State countered that the offer had been 45 years, not 28 years. The court stated, "the last time we were together, after a rather lengthy 402 conference, I proposed the [28-year] sentence" and "it was, in fact, over the State's objection, but I did so only after hearing from various members of the victim's family." There is no transcript of the 402 conference in the record.

¶ 9    The court then asked Gibson if he still intended to plead guilty to first degree murder and admonished him of the sentencing range, which was 20 to 60 years in prison. It noted that if Gibson pled guilty, he would be giving up his right to a trial by jury, and the court then asked Gibson to "[t]ell me about it." Gibson stated that a trial is where "12 members of the jury, they look at the case and decide whether you are guilty or innocent." The court stated that it observed Gibson execute a jury waiver in his presence, and that it was knowingly and voluntarily given. The court asked if any promises or threats had been made to Gibson in exchange for his guilty plea, to which he responded, "No, your Honor."

¶ 10    The parties then agreed to the following stipulated factual basis for the crime. The victim, Thelma Gibson, age 59, was Gibson's mother. At or about 10:15 a.m. on July 3, 2005, the victim was at her residence. She was sleeping on the first floor.

¶ 11    Gibson entered the victim's residence, went into her room with a knife, and began stabbing her multiple times. One of the victim's granddaughters saw this happen and called for her mother. The victim's two daughters ran downstairs, one of which witnessed Gibson stabbing the victim multiple times. The victim was able to run out of the house but eventually fell and succumbed to her stab wound injuries. The victim sustained one stab wound and one incise wound to the head, nine additional wounds to the torso, and 13 wounds to the extremities. If called to testify, the medical examiner would testify that the victim died of multiple stab wounds and incise wounds.

¶ 12    Gibson was placed under arrest the next day, at which time he told Detectives Burke and Gonzales that he had gotten a knife off the kitchen counter in his mother's house and that he stabbed her multiple times. The knife was found under Gibson's bed, and it matched the set of four knives, one of which was missing, in the kitchen. An additional butcher knife was found between Gibson's mattress and box spring.

¶ 13    Following the stipulation for the factual basis, the trial court accepted Gibson's guilty plea and asked if he cared to say anything. Gibson responded:

> "Yes, your Honor. I love my mother, your Honor, and I think the prison time is time to understand what happened because I really didn't understand. I don't want to place my family in any danger knowing what happened and things like that. I'm sorry."

¶ 14    The trial court then sentenced Gibson to 28 years in prison. Gibson did not file a direct appeal.

¶ 15                    B. Postconviction Proceedings

¶ 16    On May 16, 2023, Gibson filed a motion for a reduction of sentence. As a basis for this request, he stated:

"Based on me being Not Guilty. I had a black-out July 3, 2005 and was charged with killing my mother whom I love dearly. I didn't and still don't remember anything. I am currently getting treatment for my mental health in Dixon Correction Center Mental Ward."

¶ 17    On June 23, 2023, the motion to reduce sentence was denied.

¶ 18    On October 6, 2023, Gibson filed a *pro se* postconviction petition pursuant to the Act. He alleged the following:

"My Constitutional rights were violated July 4, 2005 at Area 5 25th District Police Station, 5555 W. Grand Chicago, IL 60639. I was beat and forced to plea[d] guilty at my bond hearing a couple of days later. It was guilty by reason of insanity plea and it was later exchanged for a not guilty plea but by then my case was destroyed. I am currently in Dixon Psych Ward getting treatment for my mental health. My diagnosis is unspecified bipolar disorder. My constitutional rights were violated in the police station. I would like some type of relief."

¶ 19    Gibson attached an unnotarized affidavit stating that his *pro se* allegations were true and correct to the best of his knowledge and belief.

¶ 20    On October 23, 2023, the circuit court summarily dismissed Gibson's *pro se* postconviction petition, stating "he has not presented anything other than his statement."

¶ 21    Gibson filed an untimely notice of appeal on December 29, 2023. The circuit court appointed counsel to assist Gibson in filing a late notice of appeal. We granted Gibson's late notice of appeal on January 18, 2024, and this appeal follows.

¶ 22                                      II. ANALYSIS

¶ 23    On appeal, Gibson contends that his *pro se* postconviction petition made the gist of a constitutional claim that he did not knowingly and voluntarily plead guilty to first degree murder.

¶ 24    The Act (725 ILCS 5/122-1 *et seq*. (West 2022)) sets out a three-stage proceeding in which a criminal defendant may assert that his conviction resulted from a substantial denial of his rights under the United States Constitution, the Illinois Constitution, or both. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). A circuit court may summarily dismiss a postconviction petition if it determines that the petition is "frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2022). A petition is frivolous or patently without merit if it has "no arguable basis either in law or in fact." *Hodges*, 234 Ill. 2d at 16.

¶ 25    At the first stage, "[u]nless positively rebutted by the record, all well-pled facts are taken as true." *People v. Smith*, 326 Ill. App. 3d 831, 839 (2001). A defendant need only allege sufficient facts to state the "gist" of a constitutional claim for his petition to go on to the second stage. *Hodges*, 234 Ill. 2d at 9. A petition lacks an arguable basis in fact if it is based on fanciful factual allegations, such as one that is clearly baseless, fantastic, or delusional. *Id*. at 16-17. A petitioner needs to present only a limited amount of detail and is not required to include legal argument or citation to legal authority. *People v. Edwards*, 197 Ill. 2d 239, 244-45 (2001).

¶ 26    However, a "limited amount of detail" does not mean that a *pro se* petitioner is excused from providing any factual detail at all surrounding the alleged constitutional deprivation. *People v. Delton*, 227 Ill. 2d 247, 254 (2008). "Such a position would contravene the language of the Act that requires some factual documentation which supports the allegations to be attached to the petition or the absence of such documentation to be explained." *Id*. (citing 725 ILCS 5/122-2 (West 2004)). Our supreme court has held that the purpose of section 122-2 is to establish that a petition's allegations are capable of "objective or independent corroboration." *People v. Hall*, 217 Ill. 2d

324, 333 (2005). It has also held that the affidavits and exhibits which accompany a petition must identify with reasonable certainty "the sources, character, and availability of the alleged evidence supporting the petition's allegations." *Delton*, 227 Ill. 2d at 254 (citing *People v. Johnson*, 154 Ill. 2d 227 (1993)). The failure to attach the necessary affidavits, records, or other evidence, or explain their absence, is fatal to a postconviction petition and by itself justifies summary dismissal of the petition. *Id*. at 254-55 (citing *People v. Collins*, 202 Ill. 2d59, 66 (2002)). The summary dismissal of a postconviction petition is reviewed *de novo*. *People v. Petrenko*, 237 Ill. 2d 490, 496 (2010).

¶ 27    Due process prohibits the prosecution of a defendant who is unfit. *People v. Stahl*, 2014 IL 115804, ¶ 24. A defendant is unfit where, due to a mental condition, he is unable to understand the nature and purpose of the proceedings or is unable to assist in his defense. *People v. Brown*, 236 Ill. 2d 175, 186 (2010). Due process also requires a guilty plea to be entered knowingly and voluntarily. *People v. Williams*, 188 Ill. 2d 265, 370 (1999). Fitness speaks only to a defendant's ability to function within a prosecution. *People v. Griffin*, 178 Ill. 2d 65, 79 (1997). A defendant may be fit for court proceedings even where his mind is otherwise unsound. *Id*. See also *People v. Easley*, 192 Ill. 2d 307, 320 (2000) ("Fitness speaks only to a person's ability to function within the context of a trial. It does not refer to sanity or competence in other areas. A defendant can be fit for trial although his or her mind may otherwise be unsound.")

¶ 28    Defendants are presumed fit to stand trial and bear the burden of demonstrating a *bona fide* doubt of their fitness. *People v. Hanson*, 212 Ill. 2d 212, 221-22 (2004). Relevant factors to consider when determining whether a *bona fide* doubt exists include a defendant's irrational behavior, his courtroom demeanor, any medical opinions on his competency, and any representations made by defense counsel. *Brown*, 236 Ill. 2d at 186-87.

¶ 29     Gibson's petition alleges that his constitutional rights were violated when he was beaten at the police station on the date of his arrest and forced to plead guilty at his bond hearing "a couple of days later." He stated that he pled guilty "by reason of insanity," but later exchanged it for a "not guilty" plea. He further alleged that he was "currently in Dixon Psych Ward getting treatment for my mental health," and that his diagnosis was unspecified bipolar disorder.

¶ 30     Gibson apparently abandons his allegations of police misconduct on appeal, instead arguing that his postconviction petition made the gist of a constitutional claim that his due process rights were violated where he did not knowingly and voluntarily plead guilty due to a mental condition.

¶ 31     The record positively rebuts Gibson's factual allegations regarding the guilty plea proceedings. The record reflects that Gibson did not plead guilty at his bond hearing "a couple of days" after his arrest but rather pled not guilty at his arraignment on August 8, 2005. He then pled guilty on April 23, 2007, nearly two years after his arrest. His plea was never "guilty by reason of insanity," nor did he exchange his guilty plea for a "not guilty" plea at any time. Because the record positively rebuts these facts, they are not taken as true. *Smith,* 326 Ill. App. 3d at 839 (unless positively rebutted by the record, all well-pled facts are taken as true at the first stage).

¶ 32     Gibson maintains, however, that his "erroneous characterization of the guilty-plea proceedings" calls into question his ability to understand the guilty plea proceedings "and thus whether he could have knowingly and voluntarily pled guilty." We disagree. Gibson's inability to accurately recall the guilty plea proceedings in his 2023 postconviction petition is not evidence of his inability to make a voluntary and knowing guilty plea in 2007. The petition was entirely devoid of any mention of the guilty plea hearing that took place on April 23, 2007, or any reference to his mental condition at the time of the hearing. There was no identified nexus between his allegation

that he was receiving mental health treatment in 2023, and his ability to understand the nature of the proceedings against him and cooperate with defense counsel when he pled guilty 16 years prior. See *People v. Garcia*, 2015 IL App (1st) 131180, ¶¶ 54-59 (the question is not whether defendant was mentally ill or required psychotropic medication during the proceedings, but rather whether defendant "could understand the nature of the proceedings against him and cooperate in his defense"). The petition failed to state the gist of a constitutional claim that he was unfit to plead guilty in 2007.

¶ 33    Gibson nevertheless argues that the erroneous factual allegations, combined with the indication in the record that defense counsel mentioned an MRI for a possible brain tumor, and that Gibson was currently in Dixon Psych Ward, all created an implication of a fitness claim. However, there is no allegation in Gibson's petition, and no evidence in the record or attached to the petition, that show Gibson was diagnosed with a brain tumor. The record reflected that defense counsel had Gibson evaluated by an expert and was "trying to get an MRI" to "rule out" him "having a tumor in his head." Defense counsel explained that the investigation to rule out a tumor was for his defense, and not for a sanity report. Defense counsel never filed any pretrial motions, or any reports regarding a brain tumor or any aspect of Gibson's mental health.

¶ 34    Gibson maintains, relying on *People v. Bolanos*, 2022 IL App 1st 200790, that the "well-pled facts in Gibson's *pro se* petition, taken as true, raise a potentially viable claim that he lacked the mental capacity to understand the nature of the proceedings and to assist in his own defense." In *Bolanos*, the defendant stabbed her five-month-old daughter to death on May 30, 2013. *Id*. ¶ 10-11. She also stabbed herself multiple times and remained in the care of a hospital until October of 2013. *Id*. ¶ 11. On December 30, 2013, Dr. Seltzberg diagnosed the defendant with "Schizoaffective Disorder, bipolar type, multiple episodes, currently in partial remission." *Id*. ¶

18. He opined that the defendant was legally insane at the time of the incident and suffered from "an acute exacerbation of her previously undiagnosed psychotic mental disease, likely further exacerbated by postpartum psychosis." *Id*. ¶ 19.

¶ 35 In early 2016, the court stated that it would allow the defendant to plead guilty but mentally ill to first degree murder in exchange for 38 years in prison. *Id*. ¶ 25. The defendant took the plea. *Id*. ¶ 26.

¶ 36 On October 22, 2019, the defendant filed a *pro se* postconviction petition, asserting that she was still suffering from mental illness when she pled guilty three years earlier and was incapable of making an informed decision or properly defending herself. *Id*. ¶ 28. She also alleged that after she was incarcerated, she gouged out both of her eyes, which was confirmed via the Illinois Department of Corrections website. *Id*. The trial court summarily dismissed her petition as frivolous and patently without merit. *Id*. ¶ 29.

¶ 37 On appeal, this court found that the defendant's petition stated the gist of a constitutional claim that she was unfit to plead guilty, and that her petition should advance to the second stage. *Id*. ¶ 35. In making this decision, the court relied on the defendant's unusual behavior during the court proceedings, Dr. Seltzberg's report regarding her mental health, and the fact that she gouged out her own eyeballs shortly after being incarcerated. The court found that the defendant's petition sufficiently showed that the trial court would have found that a *bona fide* doubt of her fitness to plead guilty existed had the court known that, even on medication, her mental state was still sufficiently severe to lead her to gouge out her eyes. *Id*. ¶ 42.

¶ 38 *Bolanos* is inapposite to the case at bar. As mentioned above, the relevant factors to consider when determining whether a *bona fide* doubt exists as to whether a defendant is fit to plead guilty include a defendant's irrational behavior, his courtroom demeanor, any medical

opinions on his competency, and any representations made by defense counsel. *Brown*, 236 Ill. 2d at 186-87. Here, there are no facts in Gibson's petition or the record below regarding his demeanor at the guilty plea proceedings. There are no facts in the petition or the record to show that Gibson acted irrationally. In fact, Gibson rationally answered questions posed by the trial court regarding his intentions to plead guilty, and defense counsel affirmatively stated that Gibson's sanity was not at issue. There are no reports by any doctors anywhere in the record regarding Gibson's mental health. While defense counsel mentioned a possible MRI for a brain tumor, there is no nexus identified between the need for an MRI and a mental illness at the time of the plea that would render Gibson unfit to plead guilty. There is simply no indication in the allegations of the postconviction petition that create a factual dispute about whether there was a *bona fide* doubt of Gibson's fitness to plead guilty in 2007. Accordingly, we find that the trial court properly dismissed Gibson's *pro se* postconviction petition where it did not state the gist of a constitutional claim that he was unfit to plead guilty.

¶ 39                                    III. CONCLUSION

¶ 40     For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 41     Affirmed.