**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 170290-U

Order filed January 8, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 9th Judicial Circuit, Fulton County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-17-0290 Circuit No. 10-CF-75 |
| | ) | |
| JASON A. PHILLIPS, | ) ) | Honorable Thomas B. Ewing, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE WRIGHT delivered the judgment of the court.
Presiding Justice Lytton and Justice Holdridge concurred in the judgment.

_____

**ORDER**

¶ 1   *Held*:   (1) Circuit court's denial of postconviction relief following third-stage evidentiary hearing did not constitute manifest error; (2) defendant failed to rebut presumption that postconviction counsel rendered reasonable assistance; and (3) circuit court's striking of affidavit at second stage amounted to harmless error.

¶ 2   Defendant, Jason A. Phillips, appeals from the denial of his postconviction petition

following a third-stage evidentiary hearing. He argues that the Fulton County circuit court's

judgment was manifestly erroneous with respect to multiple claims in the petition. He also

argues that postconviction counsel provided an unreasonable level of assistance at that hearing, and that the court erred by striking an affidavit at the second stage. We affirm.

¶ 3                                              I. BACKGROUND

¶ 4         The State charged defendant via information with one count of criminal sexual assault (720 ILCS 5/12-13(a)(4) (West 2008)). The charging instrument alleged that defendant inserted his finger into K.E.'s vagina at a time when K.E. was over 13 years of age but under 18 years of age and defendant was in a position of trust, authority, or supervision over her.

¶ 5         Defendant's jury trial commenced on April 18, 2011.[1] K.E. testified that she met defendant in 2008 when she began attending the church at which defendant was a youth pastor. K.E. regularly attended youth services, where she got to know defendant and his wife, Ashley. Over time, K.E. and her sister, Nicci, became close with defendant and Ashley, often going to their house and babysitting their children.

¶ 6         K.E. testified that in the summer of 2009 her relationship with defendant evolved into a "dating relationship." They frequently went to movies or to dinner alone. K.E. testified to three specific instances of sexual contact between her and defendant. The third of these incidents occurred in October 2009. K.E. went to a haunted house with defendant, Nicci, and defendant's brother, John Phillips. The group was in a dark maze portion of the haunted house when K.E. and defendant became separated from Nicci and John. K.E. testified that defendant reached from behind her and inserted his finger into her vagina. He stopped when they heard Nicci and John approaching.

---

[1]This court previously set forth the trial evidence in great detail in defendant's direct appeal. *People v. Phillips*, 2013 IL App (3d) 110452-U. Only those facts necessary to a disposition in the present case will be recounted here.

¶ 7       On cross-examination, K.E. denied asking defendant for an iPod or a car for Christmas in 2009. On redirect, she testified that she did not fabricate her allegations because defendant would not buy her an iPod or a car.

¶ 8       K.E. also testified, over defendant's objection, to a series of text messages exchanged between her and defendant on May 10, 2010. After some initial text messages, K.E. began to save the texts to her phone and e-mail them to herself. K.E. testified that the unsaved text messages consisted of her telling defendant that she had told a friend about their relationship, and defendant inquiring as to who else she had told. In the text messages, defendant told K.E. that he did not know what to do, and expressed concern for his feelings. Later, defendant stated: "That's why I didn't want it to go too far because what could have happened." In our previous order, we reproduced the entire conversation, ultimately describing the texts as "corroborat[ing] K.E.'s testimony about the sexual relationship and contain[ing] incriminating statements by defendant." *Phillips*, 2013 IL App (3d) 110452-U, ¶¶ 21, 33.

¶ 9       The State also introduced into evidence a recorded statement made by defendant during an interrogation, also over defendant's objection. In the video, the investigating officers inform defendant that K.E. has accused him of "inappropriate touching" and that they have text messages that support the allegation. The officers ask defendant if he had a "boyfriend-girlfriend" relationship with K.E. Defendant responded: "I don't think so."

¶ 10      In her testimony, Nicci corroborated much of K.E.'s testimony concerning the girls' relationship with defendant and his family. Nicci observed that beginning in the summer of 2009, defendant "always asked [K.E.] to go everywhere with him." Nicci recalled having a conversation with K.E. on May 10, 2010, in which K.E. talked about "things that had been going

3

on" between her and defendant. K.E. was crying throughout the conversation. Nicci did not recall K.E. ever asking defendant or his family for a gift.

¶ 11 The jury found defendant guilty.

¶ 12 Defendant subsequently filed an amended posttrial motion in which he argued, *inter alia*, that the State had failed to prove him guilty beyond a reasonable doubt because "K.E.'s testimony was manufactured, manipulated, and perjurious." In support of that assertion, defendant alleged that K.E., Nicci, and another State's witness had told people that they had been lying.

¶ 13 Prior to the hearing on defendant's motion, the State objected to the calling of witnesses to impeach K.E.'s trial testimony. Defense counsel argued that he had been approached with this new information after trial. Counsel conceded, "I suppose the argument can be made that we could have done a more thorough investigation," but insisted that an investigation was done and that these particular witnesses only contacted him after the fact. The court ultimately allowed defendant to call his witnesses.

¶ 14 Christopher Spahn testified that he was in a car with K.E. and a third person in the summer of 2010. He testified that K.E. confided that she was tired of "not getting her way" and of not being allowed to babysit as much as she would have liked. Spahn testified that K.E. told him "that it was a lie" and that "nothing ever happened between them."

¶ 15 Dillon Smith testified that in 2010 he dated Rachel Bybee. Defense counsel asked Smith about a conversation between Bybee and K.E. that Bybee had relayed back to him. The court declined to allow Smith to answer the question, pointing out that his response would be double hearsay.

4

¶ 16 Wayne Morgan testified as an "expert in the area of cell phone and communication technology." Morgan testified that text messages can easily be manipulated or doctored. He testified that several applications for such editing are publicly available.

¶ 17 K.E. was called by the State, and testified that she never told Spahn that she had lied about the sexual contact between her and defendant.

¶ 18 The circuit court denied defendant's posttrial motion and, after a sentencing hearing, sentenced defendant to a term of four years' imprisonment. This court affirmed on direct appeal. *Phillips*, 2013 IL App (3d) 110452-U. Specifically, this court found that the circuit court had not abused its discretion in admitting either the text message evidence or the video recording of defendant's interrogation statement. *Id*. ¶¶ 34-35, 47. This court also found that the evidence submitted at trial was sufficient to prove defendant guilty beyond a reasonable doubt. *Id*. ¶ 54.

¶ 19 On November 13, 2013, defendant, via new counsel, filed a postconviction petition. The petition raised numerous allegations of ineffective assistance of trial counsel. Defendant attached 12 affidavits to the petition in ostensible support of his claims. Attached to the petition was a handwritten document labeled "Pro Se Post Conviction Pettition [*sic*]." In that document, which was never independently filed, defendant alleged that counsel had provided "ineffective advice" when he suggested defendant not testify, despite defendant's "adam[a]nt" desire to do so. Defendant alleged that the "ineffective advice" was prejudicial because "had I taken the stand I could've denied the allegations and explained the video interrogation and the text message [*sic*]." The circuit court advanced defendant's petition to second-stage proceedings on February 12, 2014, and counsel subsequently filed a Rule 651(c) certificate.

¶ 20 On December 2, 2014, defendant filed an amended petition for postconviction relief. The petition alleged, *inter alia*, that trial counsel had been ineffective for failing to conduct a

5

reasonable investigation. Defendant alleged that a proper investigation would have led counsel to talk to John, who could have provided testimony regarding the incident at the haunted house. Defendant also alleged that a proper investigation would have led counsel to obtain "useful statements from Patience Young, Chris Spahn, Amanda Hargr[a]ve, Charity Mears, Mariah Marlette, Akeyla Dugan, and Dillon Smith."

¶ 21 The amended petition also alleged that trial counsel had been ineffective for failing to adequately consult with defendant prior to trial. Defendant asserted that

"[p]roper consultation by defense counsel was necessary in order to discuss the evidence that the State would introduce, witnesses that the defendant sought to have introduced, possible witnesses, an investigation, and most importantly, prepare the defendant to testify or make a reasoned calculation not to testify."

Later in his "Failure to Adequately Consult" allegation, defendant clarified:

"Defense counsel failed to discuss the text messages with [defendant]. In order to adequately prepare to address the text messages at trial, defense counsel could have either obtained an expert witness (Carl Morgan) to question the authenticity of the messages, or ask [defendant] to explain the messages. He did neither."

Defendant also alleged that on the "few" occasions that counsel did meet with him, defendant "felt rushed."

¶ 22 Elsewhere in his petition, under the heading "Errors in Trial Strategy," defendant again raised the issue of the text messages. He alleged that "[c]ounsel had two reasonable options" for addressing the text messages at trial, the first being to call Morgan to cast doubt on the texts' authenticity. The second option, defendant continued, would have been for defendant to "explain the context and meaning of the messages. Said conversation would have been a part of any

6

reasonable trial preparation. This would have involved preparing [defendant] to testify, or at least would have figured into the calculation of whether or not he testified. This was not done."

¶ 23    Defendant attached eight affidavits to his amended petition, many of which are not relevant to the present appeal. The first of these affidavits was from private investigator Jimmy Hinkle. Hinkle averred that he was a close friend of defendant and offered to perform a free investigation before the trial. Defense counsel declined Hinkle's services. Hinkle conducted an investigation after trial that led him to speak with many people and obtain a number of affidavits.

¶ 24    John also provided an affidavit, in which he recounted the trip to the haunted house tour with defendant, K.E., and Nicci. John stated that defendant was never alone with K.E. on the tour, and that John "was never out of sight or hearing range of [defendant], K.E., and [Nicci]."

¶ 25    In an affidavit sworn by Charity Mears, she averred that she overheard K.E., in 2009 and 2010, ask defendant to buy her a car. When defendant declined, K.E. became angry and frustrated. Mears also averred that K.E. and Nicci teased her and "are not very nice people and are mean."

¶ 26    Smith averred that his girlfriend, Bybee, "used to be best friends with [K.E.] and Nicci." Smith stated that Bybee told him that K.E. and Nicci told her on multiple occasions that K.E. was lying about the sexual contact between her and defendant.

¶ 27    The amended petition incorporated by reference some of the affidavits attached to the original petition. These included affidavits from Amanda Hargrave and Spahn. Hargrave averred that in the summer of 2010 Nicci told her that K.E. lied about defendant having sexual contact with her because K.E. was mad that defendant would not buy her a car. She further stated that, according to Nicci, K.E. had threatened Nicci to prevent her from coming forward with the truth.

7

Spahn's affidavit repeated the testimony he provided at the posttrial hearing, namely, that K.E. told him that she lied about the sexual contact between her and defendant.

¶ 28        On June 14, 2016, circuit court judge William Davis filed a written second-stage order; a similar amended order was filed on July 29, 2016. In those orders, after extensive analysis, the court wrote: "All the allegations of ineffective assistance of counsel related to the text messages are dismissed without leave to re-plead." The court similarly dismissed "[a]ll of [defendant's] allegations of ineffective assistance of counsel regarding the video."

¶ 29        Elsewhere in its written orders, the court addressed each affidavit that had been filed. Citing the frequent appearance of hearsay, personal opinions, and otherwise irrelevant information, the court struck a number of the affidavits and refused to consider them in reaching its second-stage decision. Among those affidavits struck by the court was that of Smith. As to that affidavit, the court ruled that any statements made by K.E. and Nicci to Bybee were double hearsay.

¶ 30        In considering each affidavit, the circuit court, curiously, addressed Hargrave's affidavit two separate times. First, the court struck the affidavit from Hargrave, noting that it contained only hearsay. Later, however, the court commented that while hearsay, Hargrave's testimony could be used to impeach Nicci, at least implying that the affidavit should not be stricken.

¶ 31        After dismissing the claims related to the text messages and interrogation video and striking the affidavits, the court allowed that any "issues still remaining" should be set for a third-stage evidentiary hearing.

¶ 32        Prior to the third-stage hearing, the State filed a motion seeking clarification. Noting that Judge Davis had retired and that the assistant state's attorney on the case had left the office, the State sought an order clarifying which issues still remained. On December 2, 2016, a handwritten

8

order signed by the court was filed, indicating that "Per order of Judge Davis, June 14, 2016, 'issues still remaining' are–Trial counsel Failed to consult with his client prior to trial *** & failure to conduct pretrial investigation."

¶ 33    The third-stage evidentiary hearing was held on February 10, 2017. Defendant's first witness was Mears. Mears testified that in the fall of 2010 she overheard a conversation in which K.E. told Nicci that she wanted to ask defendant for a car. Two weeks later, Mears overheard a second conversation in which K.E. asked defendant for a car but defendant declined. Mears testified that K.E. and Nicci "storm[ed] off" and vowed to "deal with this." Mears testified that she did not come forward with this information, but was contacted after defendant's trial.

¶ 34    Next, the State called Kevin Sullivan, defendant's trial attorney.[2] Sullivan testified that in his pretrial discussions with defendant, defendant mentioned a number of potential witnesses "that would vouch for him." Sullivan explained that many of those potential witnesses would merely be character witnesses, and he thus discounted them "for relevancy reasons." Sullivan recognized that none of them had "any personal knowledge whether or not these acts complained of occurred." He also noted that many of those witnesses mentioned by defendant were children, who Sullivan was hesitant to call to testify out of concern that they are more likely to provide unexpected testimony.

¶ 35    Sullivan also recalled that defendant suggested John as a witness. Sullivan followed up by speaking with John and learned that he could provide testimony regarding the haunted house visit. Sullivan agreed that John would have testified that he did not observe anything improper between K.E. and defendant during the visit to the haunted house. Sullivan, however, had

---

[2]It is unclear in the record why Sullivan was called as a State's witness, or why the State called a witness during defendant's case-in-chief.

9

concerns about the difficulty in "trying to prove a negative like that." He was also worried that John would face cross-examination relating to his exclusive presence with defendant and K.E. in the haunted house.

¶ 36 Sullivan testified on direct examination that he did not remember defendant ever mentioning Hargrave or Mears to him. He did recall Spahn's name, and implied that he did not call Spahn to testify in order to expedite the trial. Sullivan noted that there was potential that the trial would carry over into Good Friday, and he pared down his witnesses out of concern that the jury would hold it against him if the trial went long. On redirect examination, Sullivan testified that he was certain he was aware of Spahn after the trial, but could not recall whether he had heard of him before trial. On redirect and on recross, Sullivan testified that he may have heard of Hargrave and Mears prior to trial, but declined to call them for relevancy reasons.

¶ 37 When asked if he would have done anything differently at trial, Sullivan replied: "You know, in retrospect, perhaps I should have recommended that [defendant] testify in this case to perhaps explain some things including what I viewed to be the problems with the text messages, maybe provide a different context for those." Sullivan explained that he originally recommended that defendant not testify for fear that defendant would use the "witness box [as] a pulpit and maybe done more damage than good."

¶ 38 John testified that in October 2009, he went to two haunted houses with defendant, K.E., and Nicci. He testified that the first haunted house included a maze portion, and the entire journey through the house took approximately 20 to 30 minutes. John testified that in that time he was never out of sight of defendant or K.E. He did not see any type of inappropriate touching. The second haunted house took around 10 minutes to complete. John testified that in that time,

both defendant and K.E. were "in sight at all times." Again, he did not observe any inappropriate touching. John testified that he never met with Sullivan and never conveyed to him these details.

¶ 39    At the outset of his testimony, defendant stated that Sullivan consulted with him only briefly in regard to the text messages. This testimony drew an objection from the prosecutor, who asserted that claims related to the text messages had been dismissed by Judge Davis. Postconviction counsel replied: "I know that that's what the Court ruled, but I believed in its ruling, the Court was incorrect." The prosecutor objected to what he characterized as counsel's "attempt to refile orally the whole issue that's already been addressed." The court concurred, telling postconviction counsel "that is gonna be my ruling." Subsequent references to the text messages drew sustained objections from the State.

¶ 40    Defendant testified that he felt the amount of time that he had spent with Sullivan prior to trial had been inadequate. He detailed the number of times and the amount of time he had spent with counsel. Defendant testified that he did not remember Hargrave, but that he did mention Mears to Sullivan. Defendant did not clarify whether he told Sullivan about Mears before or after trial. Defendant told Sullivan about Spahn after the trial.

¶ 41    Defendant had instructed Sullivan to contact John regarding the haunted house, but, to defendant's knowledge, Sullivan never met with John before trial. To defendant's knowledge, Sullivan did not speak with Spahn, Hargrave, or Mears before trial. Defendant testified that Sullivan never prepared him to testify. In fact, Sullivan advised him not to testify.

¶ 42    On April 19, 2017, the circuit court filed a written order denying defendant's postconviction petition. The court found that the decision not to call John or Mears to testify at trial was reasonable, noting that Mears "was not a persuasive witness, and probably would have been less so at the time of trial." With respect to Sullivan's decision not to call John, the court

11

pointed out that the jury may have found "two adult brothers accompanying young girls" to be inappropriate. The court found that Sullivan had been credible in his testimony and concluded that defendant failed to show that Sullivan did not sufficiently consult with defendant or that Sullivan did not conduct adequate investigation.

¶ 43                                    II. ANALYSIS

¶ 44        Defendant raises numerous claims on appeal. First, he argues that the circuit court's denial of his postconviction petition was manifestly erroneous on two separate grounds: (1) Sullivan was ineffective in advising defendant to not testify at trial, and (2) Sullivan was ineffective for failing to call John at trial or contact Spahn, Hargrave, and Mears, before trial. Next, defendant takes exception to the performance of postconviction counsel, arguing (3) that counsel provided unreasonable assistance in failing to secure an affidavit from Bybee and failing to call Hargrave and Bybee to testify at the evidentiary hearing. Finally, defendant argues (4) that the circuit court erred by striking the affidavit of Smith. We address these arguments in turn.

¶ 45                                   A. Manifest Error

¶ 46        At a third-stage evidentiary hearing, a defendant must prove by preponderance of the evidence that he suffered a substantial denial of a constitutional right. *People v. Pendleton*, 223 Ill. 2d 458, 472-73 (2006). Because a third-stage evidentiary hearing requires the circuit court to resolve conflicting evidence and make credibility determinations, that court's decision will not be disturbed unless it is manifestly erroneous. *Id.* at 473. A judgment is considered manifestly erroneous if it is arbitrary, unreasonable, and not based on the evidence presented. *People v. Wells*, 182 Ill. 2d 471, 481 (1998).

¶ 47        A claim of ineffective assistance of counsel is analyzed under the two-prong test established in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prevail on a claim of

12

ineffective assistance of counsel, a defendant must show that trial counsel's performance was deficient and that the deficient performance prejudiced the defendant. *Id.* A strong presumption exists that counsel's conduct was within the wide range of reasonable professional assistance and that all decisions were made in the exercise of reasonable professional judgment. *People v. Palmer*, 162 Ill. 2d 465, 476 (1994). Matters pertaining to trial strategy will usually not support a claim of ineffective assistance of counsel, even if counsel made a mistake in trial strategy or tactics or made an error in judgment. *People v. Perry*, 224 Ill. 2d 312, 355 (2007). Prejudice is demonstrated where a defendant shows that a reasonable probability exists that, but for counsel's deficient performance, the result of the trial would have been different. *People v. Enis*, 194 Ill. 2d 361, 376 (2000).

¶ 48                                1. Advising Defendant not to Testify

¶ 49        Defendant first argues that he proved by a preponderance of the evidence at the third-stage hearing that Sullivan rendered ineffective assistance when he advised defendant not to testify at trial. He contends that the circuit court thus committed manifest error by denying postconviction relief.

¶ 50        In arguing that Sullivan's advice that he not testify amounted to ineffective assistance, defendant indentifies three positive effects that his testimony could have had at trial: (1) his testimony could provide context or clarification of the text messages, (2) his testimony could have explained the interrogation video—specifically, why he replied "I don't think so" when asked if he had a boyfriend-girlfriend relationship with K.E., and (3) he could have made a "firm denial of the allegations."

¶ 51        Initially, we find that the first two points argued by defendant are fundamentally flawed. At the second stage of postconviction proceedings, the circuit court explicitly dismissed "[a]ll the

13

allegations of ineffective assistance of counsel related to the text messages" and "[a]ll of [defendant's] allegations of ineffective assistance of counsel regarding the video." The court reiterated that ruling at the third-stage evidentiary hearing when defendant began to testify regarding counsel's consultation with him about the text messages. The State objected, correctly pointing out that the court had previously dismissed all claims relating to the text messages. Postconviction counsel tacitly admitted that was true, only arguing that the dismissal had been incorrect. The court sustained the State's objection. It continued to sustain the same objection throughout that hearing.

¶ 52    The record thus makes abundantly clear that all claims of ineffectiveness "related to" or "regarding" the text messages or the interrogation video were dismissed at the second stage of the proceedings. Insofar as defendant now supports his ineffectiveness argument with the claim that his testimony could have clarified the text messages or interrogation video, defendant is raising claims that were explicitly dismissed at the second stage. The text messages and interrogation video may not be invoked to support defendant's claim that the court committed error at the third stage, because those issues were expressly not considered at the third-stage hearing.

¶ 53    To be sure, defendant was free on this appeal to raise a claim of error with respect to the second-stage dismissal. *People v. Garcia*, 2015 IL App (1st) 131180, ¶ 69. Defendant, however, has elected not to do so. Rather, he has ignored the circuit court's second-stage dismissal entirely, failing to even include reference to it in his factual summary of the case. Nor does defendant discuss any legal principles or precedent pertaining to second-stage dismissals. Any argument related to the second-stage dismissal of claims based on the text messages or the

14

interrogation video has been forfeited. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) ("Points not argued are forfeited.").

¶ 54 The remaining rationale for Sullivan's ineffectiveness for advising defendant not to testify is defendant's assertion that, if called, he could have could have made a "firm denial of the allegations." In support of the contention that counsel's advice constituted deficient performance, defendant points out that Sullivan testified at the third-stage hearing that, in retrospect, he regretted not having defendant testify.

¶ 55 Sullivan's admission that he should have advised defendant to testify does not *per se* render his failure to do so deficient performance. See *Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."). More importantly, defendant did not show by a preponderance of the evidence that he was prejudiced by his own failure to testify. A bare denial of the allegations would be implicit from the fact that defendant pled guilty and proceeded to trial, and it is dubious that such a denial would create a reasonable probability of a different result. See *Enis*, 194 Ill. 2d at 376. This is especially so when the alleged value of a testimonial denial of the charges is weighed against Sullivan's concerns about defendant's use of the witness box as a pulpit and the ubiquitous potential that cross-examination of defendant could damage his case.

¶ 56                                  2. Failure to Investigate

¶ 57 Defendant next argues that the circuit court committed manifest error by concluding that he failed to prove by a preponderance of the evidence that Sullivan rendered ineffective assistance based on his failure to conduct a sufficient investigation. On appeal, defendant

15

identifies four witnesses—John, Spahn, Hargrave, and Mears—who would have testified following a thorough investigation and whose lack of testimony at trial was prejudicial.

¶ 58                                   i. John Phillips

¶ 59     Defendant maintains that Sullivan was ineffective in that he "failed to call a witness [John,] who could have refuted one of the alleged sexual assaults." To that end, defendant characterizes Sullivan's basis for not calling John as "unreasonable." Elsewhere in his brief, however, defendant calls Sullivan's "failure to contact John" similarly unreasonable. Thus, it appears that defendant actually makes two distinct arguments on appeal: that counsel was ineffective for failing to call John as a witness as trial, and that counsel performed an insufficient investigation in that he failed to even contact John.

¶ 60     The circuit court's clarifying order of December 2, 2016, in which it indicated that the only issues remaining for third-stage adjudication were failure to consult and "failure to conduct pretrial investigation." This would seem to not include any potential claims of failure to call a witness. On the other hand, the court's second-stage dismissal of claims relating to the text messages or interrogation video would not seem to encompass the claim that counsel failed to call John to testify—a claim included in defendant's petitions. In fact, the circuit court in its third-stage order did address, and endorse, the trial strategy underlying Sullivan's decision not to call John. Thus, despite the muddled record, we find that both of these claims are properly before us on appeal: first, that Sullivan was ineffective for failing to call John as a witness at trial; and second, that Sullivan was ineffective for failing to interview John regarding his potential trial testimony.

¶ 61     The latter is easily disposed of. Sullivan testified that he spoke with John about his potential testimony. After that conversation, Sullivan made the strategic decision not to call him

16

to testify. John, meanwhile, testified that he did not meet with Sullivan to discuss his testimony. Defendant, who would have no firsthand knowledge of any such meeting, did not believe the two had met. The circuit court, faced with this conflicting testimony, explicitly found Sullivan to be credible. There are no grounds on this record to find that credibility determination to be manifestly erroneous. Accordingly, defendant's argument that Sullivan was ineffective for failing to interview John must fail.

¶ 62      We next consider whether Sullivan, having met with John before trial, was ineffective for failing to call him as a witness. Decisions as to which witnesses to call at trial are a matter of trial strategy, and those decisions thus enjoy a strong presumption of soundness. *Enis*, 194 Ill. 2d at 378. Sullivan testified that he did not call John because of the difficulties inherent in trying to prove a negative. In other words, it was highly doubtful that John could have had both defendant and K.E. inescapably in his sight the entire time they were in the haunted houses, and Sullivan expected that the State would pick up on that point on cross-examination. Further, the circuit court pointed out that the jury would find John naturally biased in favor of defendant. The court also pointed out that the jury may have found two adult brothers accompanying two teenage girls to be inappropriate. All of these were sound reasons why John should not have been called at trial. Defendant failed to overcome the presumption of a sound trial strategy, and the circuit court's conclusion to that end was not manifest error.

¶ 63                              ii. Spahn, Hargrave, and Mears

¶ 64      Defendant next argues that Sullivan's failure to contact Spahn, Hargrave, and Mears prior to trial amounted to deficient performance. He maintains that if Sullivan had contacted them as a part of his pretrial investigation, a reasonable probability exists that the outcome at trial would have been different.

17

¶ 65 If called at trial, Spahn would have testified that K.E. and Nicci told him that K.E. had fabricated her allegations against defendant. Per her affidavit, Hargrave would have testified at trial that Nicci told her that K.E. was lying and that K.E. had threatened Nicci to prevent her from coming forward. According to Mears's third-stage testimony, she would have testified to the substance of two conversations she overheard involving K.E., Nicci, and defendant.

¶ 66 Conflicting testimony was presented at the third-stage hearing as to whether Sullivan was aware of Spahn, Hargrave, or Mears prior to trial. Sullivan initially denied having heard of Hargrave or Mears before trial, though on cross-examination he allowed for the possibility. Similarly, Sullivan was certain that he knew Spahn's name after trial, but was uncertain as to whether he knew it beforehand. For his part, defendant testified the he told Sullivan about Spahn after trial. He testified that he told Sullivan about Mears, but never clarified whether that was before or after trial. Defendant did not remember Hargrave.

¶ 67 Defendant does not contend that Sullivan had a duty to independently find and interview the three witnesses in question. See *People v. Makiel*, 358 Ill. App. 3d 102, 106 (2005) ("Failure to subpoena witnesses *known to defense counsel* who contradict the State's case or provide exonerating testimony demonstrates ineffective assistance of counsel." (Emphasis added)). Rather, he argues that Sullivan knew about these witnesses, yet failed to pursue them.

¶ 68 Defendant's argument is belied by the facts adduced at the third-stage hearing. The testimony of Sullivan and defendant did not establish that Sullivan was on notice as to the three witnesses in question. Even defendant himself testified that he did not notify Sullivan of Spahn's testimony until after trial, and defendant did not even remember Hargrave. While defendant testified that he told Sullivan about Mears *at some point*, he did not testify—and thus could not prove by a preponderance of the evidence—that he told Sullivan about Mears prior to trial.

18

Accordingly, we conclude that the circuit court did not commit manifest error by finding that defendant had not satisfied his burden of proof.

¶ 69                    B. Unreasonable Assistance of Postconviction Counsel

¶ 70        Defendant next argues that postconviction counsel rendered unreasonable assistance in that he failed to procure an affidavit from Bybee and failed to call Bybee or Hargrave to testify at the third-stage hearing. Defendant also argues that postconviction failed to explain either of these omissions.

¶ 71        The sixth amendment right to counsel does not extend to postconviction petitioners, as counsel is provided under the Post-Conviction Hearing Act (Act) only as a matter of legislative grace. *People v. Cotto*, 2016 IL 119006, ¶ 29. Postconviction petitioners are thus only entitled to "the level of assistance required by the Act." *People v. Perkins*, 229 Ill. 2d 34, 42 (2007). "The required quantum of assistance has been judicially deemed to be a 'reasonable level,' a standard that is significantly lower than the one mandated at trial by our state and federal constitutions." *People v. Custer*, 2019 IL 123339, ¶ 30 (quoting *Pendleton*, 223 Ill. 2d at 472).

¶ 72        As our supreme court has recently observed: "Commensurate with the lower reasonable assistance standard mandated in postconviction proceedings, Illinois Supreme Court Rule 651 *** sharply limits the requisite duties of postconviction counsel." *Id*. ¶ 32. That rule sets forth three requirements that must be demonstrated by the record. Ill. S. Ct. R. 651(c) (eff. Feb. 6, 2013). First, the record must contain a showing "that the attorney has consulted with petitioner *** to ascertain his or her contentions of deprivation of constitutional rights." *Id*. Second, the record must show that postconviction counsel "has examined the record of the proceedings at the trial." *Id*. Third, and finally, the record must contain a showing that counsel "has made any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of

19

petitioner's contentions." *Id*. Counsel may make this showing by way of a Rule 651(c) certificate. *Id*. Such a certificate creates a rebuttable presumption of compliance with the rule. *People v. Mendoza*, 402 Ill. App. 3d 808, 813 (2010).

¶ 73 The Act requires that a petition "shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2012). That portion of the Act, however, is a pleading requirement, plainly demonstrated by the fact that it appears under the heading "Contents of Petition." *Id*. It describes the requirements for a petition to survive first- or second-stage dismissal. See *People v. Johnson*, 154 Ill. 2d 227, 240 (1993) ("A post-conviction petition which is not supported by affidavits or other supporting documents is generally dismissed without an evidentiary hearing.") As defendant's claim of failure to properly investigate *was* advanced to a third-stage hearing, it follows that an affidavit from Bybee was not, in fact, required.

¶ 74 We next consider whether postconviction counsel rendered unreasonable assistance in declining to call either Bybee or Hargrave to testify at the third-stage hearing. Our supreme court held in *Custer* that postconviction counsel's duties are "sharply limit[ed]" to the three requirements found in Rule 651(c): consultation with the petitioner, examination of the record, and amendment of the petition as necessary for an adequate presentation of petitioner's contentions. *Custer*, 2019 IL 123339, ¶ 32; Ill. S. Ct. R. 651(c) (eff. Feb. 6, 2013). On their face, none of these requirements would appear to relate to the calling of witnesses at the third stage. Nevertheless, we infer that the third requirement, which only explicitly contemplates amendment of the petition, implicitly requires "adequate presentation of petitioner's contentions" at every stage of proceedings. See Ill. S. Ct. R. 651(c) (eff. Feb. 6, 2013).

¶ 75 To support defendant's claim that Sullivan failed to conduct a proper pretrial investigation, postconviction counsel called Mears and John to testify at the third-stage hearing. Affidavits from Spahn, Hargrave, and Hinkle also provided ostensible support for that claim. See 725 ILCS 5/122-6 (West 2012) (circuit court may consider affidavits in reaching its disposition). Counsel thus produced evidence from no fewer than five witnesses.

¶ 76 On the record before us, we cannot conclude that postconviction counsel made an inadequate presentation of defendant's contentions, or that he acted otherwise unreasonably. The court took evidence from numerous sources who claimed that they had heard K.E. was being untruthful in her allegations. Bybee's testimony would have been duplicative. Meanwhile, as Hargrave's affidavit was already before the court, her testimony was not strictly necessary. This is especially so given the issues in play at the third-stage hearing. Defendant's claims of ineffectiveness turned on whether Sullivan was aware of certain witnesses before trial and his strategy in not calling certain witnesses. Neither Bybee nor Hargrave could shed any light on those key points. Defendant had already established that many witnesses were willing to provide hearsay testimony that K.E. was lying. The testimony of Bybee and Hargrave was unnecessary to further his claims. Accordingly, defendant has failed to rebut the presumption that postconviction counsel performed reasonably. *Mendoza*, 402 Ill. App. 3d at 813.

¶ 77                                    C. Smith Affidavit

¶ 78 Finally, defendant argues that the circuit court erred by striking the affidavit of Smith in its second-stage order on double hearsay grounds. Defendant contends that hearsay is allowed in postconviction proceedings, and therefore "Smith should have been allowed to testify at the evidentiary hearing."

¶ 79        Even assuming, *arguendo*, that the court erred by striking Smith's affidavit, we are unable to discern any possible prejudice defendant suffered as a result. Though the affidavit was stricken, the claim that it supported—failure to properly investigate—was still advanced to a third-stage evidentiary hearing. What is more, there is no order on the record that barred Smith from testifying at the third-stage hearing. Defendant's inference that the striking of the affidavit was tantamount to Smith not being allowed to testify is unsupported. Finally, even if Smith had testified at the hearing, his testimony would not have advanced defendant's case, for the same reasons set out above with respect to Bybee. See *supra* ¶ 75. If error was committed, it was undoubtedly harmless.

¶ 80                                    III. CONCLUSION

¶ 81        The judgment of the circuit court of Fulton County is affirmed.

¶ 82        Affirmed.