2025 IL App (1st) 221747-U

1-22-1747

SIXTH DIVISION
February 7, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 04 CR 21267 |
| ANTHONY HOUSTON, | ) ) ) | Honorable Adrienne Davis, |
| Petitioner-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE TAILOR delivered the judgment of the court.
Justices Hyman and C.A. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in dismissing petitioner's claims of ineffective assistance of trial and appellate counsel at the second stage. The trial court's dismissal of petitioner's claim of actual innocence following a third stage evidentiary hearing was not manifestly erroneous.

¶ 2    Petitioner, Anthony Houston, appeals from the circuit court's dismissal of his claims of

ineffective assistance of trial and appellate counsel at the second stage and from the court's denial of his actual innocence claim following a third stage evidentiary hearing. For the following reasons, we affirm the judgment of the circuit court.

¶ 3                                        I.  BACKGROUND

¶ 4      Houston was convicted of first-degree murder for the January 2, 2003, shooting death of Kawan Murray. Houston, while riding in a car driven by Jimmie Walls, shot Murray in retaliation for the earlier beating of Ebony Houston, who is the brother of Houston and Walls. Walls was initially a co-defendant in this case. However, immediately before trial, the State dismissed the charges against Walls and proceeded to trial against Houston alone.

¶ 5      On December 31, 2002, Shantwann Smith, who went by the nickname "Twan," went to a family New Year's Eve party with his girlfriend Christina Lampton. Also present at the party were Houston, Houston's wife Tiffany Bradfield Houston, Tiffany's mother Sandra Bradfield, Jimmie Walls, and Ebony Houston. Houston and Shantwann are cousins. Tysmar Bradfield is Tiffany's brother, but he was not at the party. Sandra is Tiffany and Tysmar's mother.

¶ 6      The following day, on January 1, 2003, Tysmar had a phone conversation with his mother Sandra. Sandra told him about a physical fight that occurred between her and Ebony at the party, which made Tysmar angry. After their conversation, Tysmar met his friend, Kawan Murray, and they went looking for Ebony to exact revenge for what Ebony did to Sandra. When they found him, Tysmar beat Ebony with a baseball bat. Ebony was taken to Holy Cross Hospital and was released that night to his father's house. Houston, Walls, and Smith all visited Ebony that night and after seeing Ebony's injuries, Houston and Walls talked about retaliating against Bradfield or Murray.

¶ 7      At Houston's jury trial, Brandi Hicks and Lovette Miles testified that between 11 and

2

11:15 a.m. on January 2, 2003, they witnessed the shooting from a second-story window of the building where Murray lived on the 6100 block of Artesian Avenue in Chicago. Hicks and Miles observed a green car pull alongside Murray's car as Murray parked his vehicle near the building. The passenger in the green car fired seven shots at Murray. Neither Hicks nor Miles saw the gunman's face. Chicago police officer Daniel Aguilera testified that immediately after the shooting, he spoke with Hicks and Miles, who described the car from which the shots were fired as a "turquoise green Grand Am."

¶ 8     Smith, Houston's cousin, testified that he received a call from Houston at about 11:15 a.m. on the day of the shooting. Smith and his girlfriend Christina Lampton then drove to a gas station where they met Houston and Walls, who were in Walls' green Pontiac. Houston told Smith the police had been to Houston's house, and he planned to drive to Indiana because police were looking for him "for a homicide or something" involving K-Dub, which was the victim's nickname. The prosecution impeached Smith with his earlier statement to an assistant State's Attorney (ASA) that when Smith met Walls and Houston at the gas station, Houston said they "got" K-Dub. Smith also was impeached with his February 2003 grand jury testimony that Houston and Walls told him that they shot the victim after pulling their car alongside the victim's car.

¶ 9     At trial, Smith disavowed his earlier accounts in which he implicated Houston in the shooting. Smith testified that Houston's involvement was merely "the story that I heard on the street." Smith denied that Houston ever told him that he killed Murray. Smith said he offered those initial accounts because he had been held at the police station for five days and police had threatened to charge him with the crime because he resembled Walls. On cross-examination, Smith stated that when he met Houston and Walls, they were in a green Pontiac Grand Prix.

3

¶ 10    Detective Lewis stated that he first responded to the scene of the shooting at 11:55 a.m. Assistant State's Attorney Rubenstein and Detective Lewis testified that they never threatened Smith. In fact, Smith stated, in both his handwritten statement and before the grand jury, that the police treated him fairly and that no threats or promises were made in exchange for his statements and that he even included in his statement that Detective Turner, another investigating officer, had been "great." In addition, Smith never told Detective Lewis or the grand jury that he made his statements simply based on the word on the street.

¶ 11    Lampton testified that she and Smith met Houston and Walls at the gas station as Smith had described. Walls was in the driver's seat of a teal-colored Pontiac, and Houston was in the front passenger seat. Smith got into the Pontiac with the two other men while Lampton remained in her vehicle. She and Smith returned to Walls' house with Houston and Walls, where Houston stated that police were trying to blame him for the shooting.

¶ 12    The State impeached Lampton with her grand jury testimony that at Walls' house, she overheard Houston admit that he shot the victim. On cross-examination, Lampton said she initially told a detective that she did not hear Houston say anything but eventually gave the detective her account of Houston's admission as "the story that was going around on the street." Lampton said she gave the statement inculpating Houston because the detective threatened to charge Smith, with whom she has a child, with murder.

¶ 13    The State presented evidence that arrest warrants were issued for Houston and Walls in October 2003. Walls was arrested in Indiana in May 2004, and Houston was arrested in Texas in August 2004. In October 2003, the gun used in the instant shooting was recovered by police during a traffic stop of a person unrelated to this offense.

¶ 14    For the defense, Houston's wife Tiffany testified that on the morning of January 2, 2003,

Houston and his sister took their black car to a mechanic. About 10 or 15 minutes after Houston left, detectives came to her and Houston's residence seeking to question him about a murder. Tiffany did not remember the exact time the detectives arrived at her house but said it was between 11 a.m. and noon. Houston was not home. Tiffany called Houston and one of the detectives spoke to Houston on the phone and told Houston that he needed to speak with him about a murder. The detectives left and then returned 20 or 25 minutes later but Houston did not meet up with them. The detectives asked Tiffany to call Houston again so she did. The detectives once again spoke with Houston on the phone and left about 20 minutes later. That night, Smith and Lampton picked up Tiffany and they drove to another location and picked up Tiffany's son. The group then drove to Indiana, where Tiffany and her son were dropped off at a motel.

¶ 15    In a sidebar discussion, the prosecution argued that the defense attempted to present an alibi for Houston through his wife Tiffany's testimony and that defense counsel had not listed an alibi defense in its answer to discovery. The trial court agreed and struck the portion of Houston's testimony regarding Houston's whereabouts on the morning of the shooting.

¶ 16    The jury found Houston guilty of first-degree murder and also found that Houston personally discharged a firearm that proximately caused Murray's death. The trial court sentenced Houston to 60 years in prison.

¶ 17    On direct appeal, Houston challenged the sufficiency of the evidence, pointing to the disavowed statements of Smith and Lampton and the absence of physical evidence linking him to the shooting. Houston also argued, *inter alia*, that the trial judge erred in striking his wife Tiffany's testimony as an impermissible account of an alibi. This court rejected those contentions and affirmed Houston's conviction and sentence. *People v. Houston*, No. 1-07-0146 (2008) (unpublished order under Supreme Court Rule 23).

¶ 18    On December 15, 2009, Houston filed a *pro se* postconviction petition arguing actual innocence. In support of that claim, Houston attached an affidavit of Hershel Morgan, who was Houston's cellmate in Stateville Prison. In his affidavit, Morgan, who is white, attested that he, and not Houston, shot the victim while riding in a car driven by Smith.

¶ 19    Also attached to Houston's petition was Walls' affidavit stating that he and Houston did not commit the shooting. Walls stated that he wanted to testify on Houston's behalf but did not do so after the State threatened to re-indict him for the instant crime. Houston also attached an affidavit from Tiffany wherein she stated that Houston was at home with her the morning of January 2, 2003, and left the house around noon with his sister to visit a neighborhood mechanic. None of the affidavits attached to Houston's petition were notarized and none of the affiants indicated in their affidavits that they were willing to testify in court.

¶ 20    Houston's petition also set out numerous theories of ineffectiveness of trial and appellate counsel, including that his trial counsel's performance was deficient because counsel failed to preserve the ability to raise an alibi defense. On February 8, 2010, the circuit court dismissed Houston's petition at the first stage as frivolous and patently without merit. Houston appealed.

¶ 21    On appeal, Houston argued that the trial court erred in dismissing his petition at the first stage where he presented an arguable claim of actual innocence because the petition was accompanied by Morgan's confession to the crime for which he was convicted. We determined that Morgan's affidavit was newly discovered evidence and therefore found that Houston sufficiently alleged an actual innocence claim and remanded for second-stage proceedings. *People v. Houston*, 2012 IL App (1st) 100864-U.

¶ 22    On February 23, 2012, two months before this court issued its order remanding to the circuit court, Houston filed a *pro se* successive post-conviction petition stating that he found

additional support for his actual innocence claim and attached affidavits from his father and Luvert Paul. In his affidavit, Paul attested that he witnessed the shooting in the instant case and described the shooter as a white male. Paul stated that he saw Houston's father at a funeral in 2008 and told him exactly that. Houston's father, also named Anthony, asserted in his affidavit that he saw Paul at a funeral, who told him that he witnessed the shooting, and that Houston was innocent.

¶ 23    On January 27, 2016, Houston, through counsel, filed an amended post-conviction petition arguing, *inter alia*, actual innocence, ineffective assistance of trial counsel for failing to file an alibi defense, and ineffective assistance of appellate counsel for failing to raise the issue of trial counsel's ineffectiveness on direct appeal. The State agreed to advance the actual innocence claim to third stage proceedings but filed a motion to dismiss Houston's other claims.

¶ 24    Following arguments on the motions, the trial court ruled that Houston made a substantial showing of a constitutional violation to warrant an evidentiary hearing with respect to his actual innocence claim but dismissed his other claims at the second stage. The court ruled that Houston's ineffective assistance of counsel claims regarding the alibi defense failed because trial counsel's decision not to file an alibi defense could have been sound trial strategy and Houston was not prejudiced by the omission of Tiffany's testimony because, even if admitted, Tiffany could not recall exactly when Houston left the house and was not present with Houston when he allegedly drove to the mechanic. The trial court further found that the claim was forfeited where it could have been raised on direct appeal.

¶ 25    Prior to the evidentiary hearing on Houston's actual innocence claim, defense counsel filed a motion to admit the affidavits of Luvert Paul and Sheina Jones at the evidentiary hearing in lieu of their live testimony because they were evading service. The State did not object to the

affidavits being admitted as evidence.

¶ 26    At the evidentiary hearing, Houston introduced the transcript and video of Phillip Willis's deposition testimony that occurred on April 21, 2021. In the deposition, Willis testified that he had been living in Arizona for the past five years, but that he lived at 6743 South Wabash in Chicago on January 2, 2003. At about 11 a.m. on January 2, 2003, Willis was driving to Sears located at 61st and Western and as he was driving up Artesian, a "blueishgreen" colored car about five or six car lengths in front of him pulled over, and a man got out of the passenger side. The man fired two or three shots at an orange-colored car. Willis testified that he saw the shooter for about three seconds and that he was wearing a black hoodie with the hood pulled up. Despite the hood, Willis could tell the shooter was white by his profile. Willis also said that he saw the driver, who was a black man, open the car door and stand up, with one foot on the street and one foot in the car, while the other man fired. Willis testified that both men got back in the car after shooting. Willis backed up and left. He never reported the shooting to the police because he was concerned about gang activity.

¶ 27    In 2014, 11 years later, Willis saw a poster in the window of a grocery store near 63rd and Western that had a number to call about this shooting because a man had been falsely accused. Willis testified that he called the number, spoke to Houston's father, and told him what he saw. Willis eventually gave a written statement.

¶ 28    On cross-examination at the deposition, Willis acknowledged that he did not know whether this was a gang-involved shooting; he just assumed it was. Willis stated that he did not write out his own statement. A man that was with Houston's attorney wrote down what he said. Willis stated that he was about 50-60 feet away from the shooter and was moving at a speed of about 30 miles per hour when he saw the shooting. He saw the shooter extend his arm but did not

see his hand or the gun. Willis said that between the time of the shooting in 2003 and 2014 when he came forward, he did not tell anyone about the shooting. Willis claimed he "forgot all about it." Willis denied having multiple conversations with Investigator Rick Lombard from the State's Attorney's Office in 2017, denied scheduling any appointments with him and then failing to show, and denied telling Investigator Lombard that he was out of town and refusing to tell him where.

¶ 29    Houston then introduced the affidavits of Luvert Paul and Shehina Jones. Neither appeared in court. In his affidavit, Paul stated that he was in the 6100 block of South Artesian between 11 a.m. and noon on January 2, 2003, to buy marijuana. While there, he saw Shantwann Smith driving a light green car even though Smith usually drove a white Cadillac. There was a white man in the passenger seat of the light green car being driven by Smith. He saw the light green car pull up next to a parked gold car. The white man in the light green car started shooting out of the passenger side window. Paul stated that he was a few car lengths behind the shooting. He dove into his own car when the shooting started, and remained there until the shooting stopped. He then drove away. Later that day, his girlfriend Doneisha heard that K-Dub was murdered. He told Doneisha that he witnessed a shooting, and Doneisha asked him not to tell anyone because both sides were dangerous. Several days later, Smith approached Paul in a liquor store and threatened to kill him if he told anyone what he saw.

¶ 30    Paul later broke up with Doneisha but spoke with her again in 2006 when she told him that Houston was convicted of murder. Paul knew that Houston's parents lived across the street from Doneisha. He felt guilty but said nothing because his "life was more important to me at that time."

¶ 31    Paul attended a funeral in 2008 where he saw Houston's father. Houston's father

recognized Paul from when he used to live with Doneisha. Paul's "conscious really started bothering" him so he told Houston's father what he saw and agreed to give an affidavit. However, after their meeting, Paul lost Houston's father's phone number and was unable to contact him. Paul saw Houston's father again in June 2011 and they exchanged phone numbers. Paul provided an affidavit shortly thereafter. In his affidavit, Paul stated that he would be willing to testify to the substance of his affidavit in court.

¶ 32    In an affidavit dated October 15, 2014, Jones averred that she and a friend were in the 6100 block of Artesian Avenue on January 2, 2003, to buy marijuana. She saw "Twan" drive past her in a light green car though he usually drove a big white car. A white man with a black hoodie around his face was in the passenger seat. Jones was still able to see his profile and that he was a white male. The light green car stopped near a parked gold car and the white man stuck his arm out and fired five or six shots into the gold car.

¶ 33    The parties then stipulated that E. Wayne Bunch took the sworn affidavit of Shehina Jones on October 15, 2014, at 6645 South Honore in Chicago. Jones's sister was present at that time, along with Houston's attorneys. Bunch was hired by Houston's attorneys. The parties further stipulated that, if called to testify, Bunch would testify that:

> "[A]s a former homicide detective with the Chicago Police Department and long time licensed private investigator he is trained and experienced in taking statements from witnesses.
>
> In this case all of the parties sat around the witness' dining room table and affiant verbally gave her statement.
>
> Mr. Bunch would testify that he transcribed the witness' statement onto his standard witness statement form which has been tendered to the court.

After transcribing the statement, Mr. Bunch gave the witness the opportunity to review the statement and make corrections.

The witness did make a correction on page 2 of the statement. This is Ms. Jones' initials and my initials appear next to the correction.

After reviewing the document with Ms. Jones, I notarized the document in her presence. Ms. Jones never signed a blank page except for the heading as she informed the Cook County State's Attorney's Office conviction integrity unit."

¶ 34 Houston rested.

¶ 35 Before proceeding, the State asked the court to clarify if Houston agreed with his attorney's decision not to call Hershel Morgan as a witness, who was present in the building at the time. Houston's attorneys said they chose not to call Morgan as a matter of trial strategy. Houston confirmed on the record that he discussed this with his attorneys, that he was aware of Morgan's initial statements that he killed Murray, and still agreed not to call him as a witness.

¶ 36 The State then introduced into evidence a report prepared by Investigator Lombard regarding his interview with Luvert Paul. In that report, Lombard detailed that in his first conversation with Paul on the phone on February 27, 2017, Paul "stated that he did not remember much about the shooting of Kawan Murray." However, Paul agreed to be interviewed at his home by Lombard and ASA Gina Savini on March 1, 2017. In that interview, Paul stated that the shooting occurred during daylight hours, but he could not remember the time of year or the season. He said that he went to the area to buy marijuana, got out of his car, saw some guys on a porch, and then a car drove past him. Paul said that he did not remember which side of the car was closest to him or the color of the car, but that there were two occupants in the vehicle and that one was a male black and the other was either a "male white or male black with light

colored skin." Paul did not remember where in the car they were seated, but did say that they both wore black and neither wore a hat. Paul stated that he was sure that neither of the men in the car was Houston as he knew Houston from his old neighborhood on 71st Street.

¶ 37    Paul further stated to Lombard that, as he was exiting his vehicle, he heard approximately nine gunshots. He said that the shots had to come from the passing car but could not see who was shooting. Paul stated that he assumed the shots were directed at the guys on the porch. He immediately got back in his car and drove home and later learned that someone had been shot.

¶ 38    Paul told Lombard and ASA Savini that he did not remember the name of his girlfriend at the time of the shooting. He denied ever having a girlfriend named Doneisha or a girlfriend that lived in the 6400 block of Winchester. He also denied telling anyone that he had just witnessed a shooting.

¶ 39    Paul said that he met Houston's father in a store three months after the shooting, though he did not remember where the store was located. Paul said that is when he learned that Houston had been charged with murder. During that meeting, Paul told Houston's father what he had witnessed. Paul further stated that he spoke with Houston's attorney and told him what he witnessed, but did not know why he was not asked to testify at Houston's trial.

¶ 40    During the interview, Paul was given a copy of his five-page affidavit and confirmed that it was his, but he had no specific recollection as to whether he wrote it and denied that he underlined any of the portions in the document.

¶ 41    The State also introduced into evidence an investigative report prepared by Lombard during his interview with Shehina Jones. Jones was interviewed in her home on March 1, 2017, by Lombard and ASA Savini. During that interview, Jones stated that, on January 2 or 3, 2003, she was driving in a car with a friend to the area of 61st and Artesian to buy marijuana. Her

friend parked the car on the east side of the 6100 block of south Artesian, exited the car, and walked through a gangway. Jones remained in the front passenger seat of the car. She saw several young men on a porch and then saw a green colored car drive past her and then back up. When the green car was even with a gold-colored car parked on the west side of Artesian, Jones was able to see two figures inside the green car. She could not see their faces and did not know their race or gender. She also did not know who, if anyone, was in the gold car. Jones heard two or three gunshots, looked up, saw flashes coming from the driver's side of the green car, and then ducked down. She did not see who was shooting.

¶ 42    Jones stated that she was scared and did not tell anyone about the shooting until she saw a flyer hanging on a light pole near 63rd and Artesian. The flyer was looking for people who witnessed a shooting on 61st and Artesian around the time of the incident she observed. Jones called the number on the flyer and was visited by two men. She recounted what she saw, and one of the men took notes.

¶ 43    When asked, Jones told Lombard that "she does not now, or at the time of this incident, know a man named 'Twan.' " Jones said that she remembered hearing from her friend that a "Twan" sold marijuana on the 6100 block of South Artesian, but that she never met him. Jones further stated that she did not know what kind of car Twan drove and did not know any "Twan" that drives a white Cadillac. Lombard's report indicates that when Jones was shown the three-page affidavit bearing her name, "Jones appeared surprised and stated most of the affidavit was not true." Jones said that she was presented with the three pages by the men who visited her after she called the number on the flyer, but that the pages were blank except for the heading on page one with Jones' name, and the date, time, and location. Jones acknowledged that her signature appeared on the bottom of each page of the affidavit but stated that she signed the pages when

they were blank. Jones circled the heading on page one and wrote, "This was only thing on paper when signed." She also crossed off on the affidavit what she said was not true and wrote, "This not ture [sic]" and "Not ture [sic]." Jones further stated that she did not see any white males near or at the shooting on Artesian. She also stated that she did not know Houston, Houston's father, anyone named "Twan," "K-Dub," or Kawan Murray.

¶ 44     The State rested.

¶ 45     Following closing arguments, the circuit court issued a 14-page written ruling. In its ruling, the court noted the legal standard for an actual innocence claim based on newly discovered evidence:

> "The evidence in support of the claim must be: (1) newly discovered; (2) material and not merely cumulative; and (3) of such a conclusive character that it would probably change the result on retrial. *People v. Ortiz*, 235 Ill. 2d 319, 331 (2010). 'Conclusive' evidence is evidence that, when considered along with the trial evidence, would probably lead to a different result.' *Coleman,* 2013 IL 113307, ¶ 96 (citing *People v. Ortiz*, 235 Ill. 2d 319, 336-337 (2009)). In showing one's actual innocence, one need not show total vindication or exoneration. *People v. Robinson*, 2020 IL 123849, ¶ 55. Probability, not certainty is key in determining whether the fact finder would reach a different result after considering the trial evidence along with the new evidence. *Id*. at ¶ 48."

The circuit court concluded that the evidence Houston claimed was evidence of his actual innocence was not conclusive and would not lead to a different outcome at trial.

¶ 46     With respect to Phillip Willis' testimony that he saw that the shooter was a white male from approximately 50 feet away, the circuit court found that this only added conflicting evidence to the identification evidence presented at trial. The court noted that Willis' testimony

conflicted with Shantwann Smith's and Christina Lampton's original statements identifying Houston as the shooter, Houston's admission of guilt, and his flight from Illinois. The court further found that Willis's testimony was inconsistent with the other evidence offered by Houston at the evidentiary hearing, namely the affidavits of Paul and Jones wherein they averred that the shooter remained in the vehicle and shot from the passenger seat with an arm extended out the window.

¶ 47     The circuit court also found that Willis was incredible for numerous reasons: (1) his demeanor, responses on cross-examination, and impeachment at his deposition; (2) his relationship with Houston's family; and (3) the length of time, 11 years, that he waited to come forward after the shooting; and, (4) the circumstances under which he decided to come forward, that is, after seeing a flyer and speaking with Houston's family. The circuit court noted that Willis "clearly could have learned that the shooting he witnessed had resulted in charges being filed, and clearly could have learned that a black man and not a white man had been charged for this shooting" in the decade prior to his affidavit.

¶ 48     With respect to Luvert Paul's affidavit, the circuit court noted that because he did not testify at the evidentiary hearing, the court was left solely with his affidavit and had no indication that Paul's refusal to testify would not continue at a retrial. The court determined that although Paul indicated in his affidavit that he would be willing to testify to its contents in court, Paul's reason for not testifying at the evidentiary hearing, that he was scared, was "illogical and incredible" where Paul already provided a sworn affidavit implicating Smith. The court also explained that it could reasonably draw a negative inference from Paul's absence at the evidentiary hearing. The court said that although Paul was available to the defense throughout the preparation of the postconviction petition and indicated a willingness to testify in court, Paul

refused to appear in court. Noting that Paul grew up with Houston's cousin, Jamale Houston, and that Paul was familiar with Houston and Houston's father, the court found Paul's credibility was further undermined by his relationship with Houston's family. As such, the circuit court afforded Paul's affidavit little weight, concluding that "Paul's affidavit is not probable to lead to a different outcome at retrial."

¶ 49     The circuit court similarly concluded that the evidence in the Shehina Jones affidavit, even if admissible at a trial, probably would not change the outcome at a new trial. The court noted Jones' failure to testify at the evidentiary hearing and the negative inferences that could be drawn from her refusal to appear in court. The court also expressed skepticism about Jones's credibility because in her affidavit Jones did not explain her whereabouts for the 19 years since the shooting or "the origins of her coming forward over a decade after the shooting" and did not attest that she would be willing to testify in court, all of which indicated that Jones was not credible. The court further questioned Jones' credibility because of her relationship with interested parties, as well as her general assertion that a while male was the shooter after Morgan provided his affidavit. As such, the circuit court found that Jones' affidavit was "not probable to lead to a different outcome at retrial."

¶ 50     The circuit court ruled that Houston failed to meet his burden to establish actual innocence and denied his postconviction petition. This appeal followed.

¶ 51                                 II.  ANALYSIS

¶ 52     Houston raises two issues in this court. First, he argues that the trial court erred in dismissing his claims of ineffective assistance of trial and appellate counsel at the second stage. Second, he argues that the trial court erred in denying his claim of actual innocence following the evidentiary hearing.

16

¶ 53    The Illinois Postconviction Hearing Act (Act) provides a three-stage process for adjudicating petitions alleging that a conviction resulted from a constitutional violation. 725 ILCS 5/122-1 *et seq*. (West 2016); *People v. Hodges*, 234 Ill. 2d 1, 10 (2009). At the first stage, the trial court reviews the petition and may summarily dismiss it if it is "frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2010); *People v. Perkins,* 229 Ill. 2d 34, 42 (2007). At the second stage, counsel is appointed, and the State may move to dismiss the petition. See *People v. Domagala*, 2013 IL 113688, ¶ 35. At the second stage, the petitioner bears the burden of making a substantial showing of a constitutional violation. *Id*. All well-pleaded facts not positively rebutted by the trial record are taken as true. *Id*. If a substantial showing of a constitutional violation is made, the petition advances to the third stage for an evidentiary hearing; if not, the petition is dismissed. *Id*. At the third stage, the trial court hears evidence and determines whether, based on that evidence, the petitioner is entitled to relief. *People v. Garcia*, 2015 IL App (1st) 131180, ¶ 46-47.

¶ 54                         A.  Second Stage Claims

¶ 55    At trial, defense counsel called Houston's wife, Tiffany, to testify. She testified that on the morning of the shooting, Houston was home with her until he left with his sister Tamika to check on his car, which was at the mechanic. After the State objected to Tiffany's testimony on the basis that the defense's answer to discovery did not include an alibi defense, the court struck her testimony. In his postconviction petition, Houston argued that trial counsel's failure to include an alibi defense in the answer to discovery denied him both the right to effective assistance of counsel and his right to testify on his own behalf, because he intended to testify that we has home with his wife at the time of the shooting. Houston supported this allegation with an affidavit wherein he averred that defense counsel told him that she "messed up." He also argued

that appellate counsel was ineffective for failing to raise this issue on appeal. He now argues that he made a substantial showing that he was denied effective assistance of trial and appellate counsel, and the circuit court erred in dismissing his claims at the second stage.

¶ 56    At the second stage, "[t]he inquiry into whether a post-conviction petition contains sufficient allegations of constitutional deprivations does not require the circuit court to engage in any fact-finding or credibility determinations." *People v. Coleman*, 183 Ill. 2d 366, 385 (1998). The Act contemplates that such determinations will be made at the evidentiary stage, not the dismissal stage, of the litigation. *Id*. In addition, at the second stage, the circuit court examines a postconviction petition to determine its legal sufficiency and any allegations not affirmatively refuted by the record must be taken as true. *Domagala*, 2013 IL 113688, ¶ 35. Thus, the substantial showing of a constitutional violation that must be made at the second stage is "a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, which if proven at an evidentiary hearing, would entitle petitioner to relief." *Id*. (Emphasis omitted). Where the circuit court dismisses portions of a defendant's postconviction petition at the second stage after finding no substantial showing of a constitutional deprivation has been made, review of the dismissal is *de novo*. *People v. Cotto*, 2016 IL 119006, ¶ 24.  We may affirm the dismissal based on any reason supported by the record because we review the judgment, not the trial court's reasoning. *People v. Anderson*, 401 Ill. App. 3d 134, 138 (2010).

¶ 57    When faced with challenges to trial counsel's effectiveness, we generally apply the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted in Illinois in *People v. Albanese*, 104 Ill. 2d 504 (1984). To prevail on a claim of ineffective assistance of counsel under *Strickland*, a defendant must show that (1) counsel's performance was deficient and (2) counsel's actions resulted in prejudice to the defendant. *Strickland*, 466 U.S. at 687;

18

*People v. Evans*, 209 Ill. 2d 194, 220 (2004). Under the first prong, a defendant must demonstrate that his attorney's performance fell below an objective standard of reasonableness. *Evans*, 209 Ill. 2d at 220. Under the second prong, prejudice is shown where there is a reasonable probability that the result would have been different but for counsel's alleged deficiency. *Id*. Failure to satisfy either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *Strickland*, 466 U.S. at 697.

¶ 58    Claims of ineffective assistance of appellate counsel are governed by the same test used in assessing claims of ineffective assistance of trial counsel set forth in *Strickland*. *People v. Lacy*, 407 Ill. App. 3d 442, 457 (2011). A petitioner challenging appellate counsel's effectiveness must show both that appellate counsel's performance was deficient and that, but for counsel's errors, there is a reasonable probability that the appeal would have been successful. *Id*. Appellate counsel need not brief every conceivable issue on appeal and may refrain from developing non-meritorious issues without violating *Strickland*. *People v. Guerrero*, 2018 IL App (2d) 160920, ¶ 43. Therefore, unless the underlying issue is meritorious, a petitioner suffers no prejudice if counsel does not raise it on appeal. *People v. Childress*, 191 Ill. 2d 168, 175 (2000). Thus, to assess the merits of Houston's ineffective assistance of appellate counsel argument, we must determine whether he received ineffective assistance of trial counsel.

¶ 59    Houston alleges that he made a substantial showing of ineffective assistance of trial counsel when trial counsel failed to include an alibi defense in Houston's answer to the State's discovery. Again, at Houston's trial, counsel attempted to have Houston's wife, Tiffany, testify that Houston was at home with her at the time of the shooting. But because counsel failed to disclose the alibi, the trial court struck Tiffany's testimony from the record and instructed the jury to disregard it. Moreover, Houston alleges that counsel's error then forced Houston not to

testify. According to Houston's affidavit, he intended to testify at his trial that he was at home with his wife at the time of the shooting, but his attorney told him that he could not testify because she "messed up" by failing to include an alibi defense in the answer to discovery.

¶ 60    The State argues that the trial court properly dismissed Houston's ineffective assistance of trial and appellate counsel claims at the second stage. The State urges that Houston's claim regarding trial counsel's ineffectiveness is not only forfeited, but the underlying issue is barred by *res judicata* and is otherwise positively rebutted by the record. Even so, the State argues Houston's claim relates to a matter of trial strategy, which may not be the basis of an ineffective assistance claim. Therefore, appellate counsel cannot be deemed ineffective for failing to raise non-meritorious issues on appeal.

¶ 61    While Houston did not raise a claim of trial counsel's ineffectiveness related to Tiffany's alleged alibi testimony on direct appeal, he did argue on direct appeal that the trial court erred in striking Tiffany's testimony, which he claimed was *not* alibi testimony. In affirming Houston's conviction on direct appeal, we stated,

> "Finally, defendant argues that the trial court erred in striking testimony from defendant's wife, arguing that it was not alibi testimony. [Citation]. Defendant did not raise this issue in his posttrial motion, which should result in waiver on appeal. Nor can the ruling be said to be the sort of plain error that would have affected the outcome of the trial. Tiffany's testimony-if not alibi testimony-was not based on any personal knowledge of whether defendant was at the scene of the shooting at the time of the shooting." *People v. Houston*, No. 1-07-0146 (Oct. 9, 2008) (unpublished order pursuant to Supreme Court Rule 23).

¶ 62    Houston's argument here directly contradicts the position he took on direct appeal,

wherein he argued that the trial court mischaracterized Tiffany's testimony as alibi testimony. At trial, Tiffany did not remember the exact time the detectives arrived at her house to speak to Houston but said it was between 11 a.m. and noon. As we have already found that Tiffany's testimony was not alibi testimony in that "was not based on personal knowledge of whether defendant was at the scene of the shooting at the time of the shooting," we cannot say that Houston was prejudiced by defense counsel's failure to include an alibi defense related to Tiffany's testimony is his answer to discovery. *People v. Flores*, 153 Ill. 2d 264, 284 (1992) (where defendant fails to prove prejudice, the reviewing court need not determine whether counsel's performance constituted less than reasonable assistance). Furthermore, Houston's right to testify was in no way affected by counsel's failure to raise an alibi defense where Tiffany's testimony did not provide Houston an alibi. Therefore, we find that the circuit court did not err in dismissing Houston's ineffective assistance of trial claim at the second stage.

¶ 63    Houston would fare no better if we considered the merits of his ineffective assistance of trial counsel claim. When viewing counsel's performance, there is a strong presumption that his conduct fell within the range of reasonable professional performance. *Strickland*, 466 U.S. at 689. Decisions on what evidence to present and which witnesses to call on a defendant's behalf rest with trial counsel and, as matters of trial strategy, are generally immune from claims of ineffective assistance of counsel. *People v. Ward*, 187 Ill. 2d 249, 261 (1999). The only exception to this rule is when counsel's chosen trial strategy is so unsound that counsel fails to conduct any meaningful adversarial testing. *Id*.

¶ 64    Defense counsel's decision not to provide notice to the State of his intent to establish an alibi through Tiffany's testimony was clearly trial strategy. Even if Tiffany's testimony could somehow be considered alibi testimony, it would be very weak alibi testimony at best. The

shooting happened around 11:15 a.m., but Tiffany said the detectives arrived between 11 a.m. and noon and that Houston left home 15 minutes before they arrived. Thus, according to Tiffany's testimony, Houston could have left home anywhere between 10:45 a.m. and 11:45 a.m. which does not conclusively establish an alibi for Houston during the time of the shooting. Furthermore, Tiffany's testimony was at odds with testimony about the normal course of the investigation, such as, for example, that Detective Lewis first responded to the scene of the shooting at 11:55 a.m. Therefore, defense counsel's failure to provide notice of an alibi defense did not constitute ineffective assistance of counsel.

¶ 65    We likewise find that the trial court did not err in dismissing Houston's ineffective assistance of appellate counsel claim based on trial counsel's ineffectiveness for failing to include an alibi related to Tiffany's testimony in discovery at the second stage. Unless the underlying issue is meritorious, a defendant suffers no prejudice as a result of appellate counsel's failure to raise the issue on appeal. *People v. Easley*, 192 Ill. 2d 307, 329 (2000).

¶ 66                            B.  Third Stage Claims

¶ 67    Houston next argues that the circuit court's denial of his actual innocence claim at the third stage was manifestly erroneous. Specifically, Houston argues that the court applied the wrong standard to the evidence when the court required Houston's evidence to be conclusive, rather than more probable than not, and placed too much emphasis on the affiants not appearing in court to testify.

¶ 68    At a third-stage evidentiary hearing, a defendant must show, by a preponderance of the evidence, a substantial violation of a constitutional right. *People v. Coleman*, 2013 IL 113307, ¶ 92. The circuit court has wide discretion in deciding what evidence to consider (*People v. Coleman*, 206 Ill. 2d 261, 278 (2002)) and acts as the finder of fact at the evidentiary hearing,

resolving any conflicts in the evidence and determining the credibility of witnesses and the weight to be given particular testimony. *Domagala*, 2013 IL 113688, ¶ 34. A circuit court's decision following an evidentiary hearing, where fact-finding and credibility determinations are involved, will not be reversed unless it is manifestly erroneous (*People v. English*, 2013 IL 112890, ¶ 23), that is, unless the opposite conclusion is clearly evident, plain and indisputable. *Coleman*, 2013 IL 113307, ¶ 98. However, if no fact finding or credibility determinations were involved, then our review of a third stage dismissal is *de novo*. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006).

¶ 69     To establish a claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial. *People v. Robinson*, 2020 IL 123849, ¶ 47 (citing *People v. Edwards*, 2012 IL 111711, ¶ 32). Newly discovered evidence is evidence that was discovered after trial and that the petitioner could not have discovered earlier through the exercise of due diligence. *Coleman*, 2013 IL 113307, ¶ 96. Evidence is material if it is relevant and probative of the petitioner's innocence. *Id*. Noncumulative evidence adds to the information that the fact finder heard at trial. *Id*. Lastly, the conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result. *Id*. ¶ 96. Ultimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. *Coleman*, 2013 IL 113307, ¶ 97. The new evidence need not be entirely dispositive to be likely to alter the result on retrial. *Id*. (citing *People v. Davis*, 2012 IL App (4th) 110305, ¶¶ 62-64). Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence. *Id*.

¶ 70     Before addressing the merits of Houston's claim, we must address Houston's argument that the trial court applied the impermissible "total vindication or exoneration" standard in ruling on the evidence presented at the third stage evidentiary hearing. The record belies this claim, making Houston's reliance on *People v. Treondous Robinson*, 2021 IL App (1st) 171371 (the circuit court improperly employed the standard of total vindication or exoneration in rendering its decision) inapposite. The court's written order specifically states, "In showing one's actual innocence, one need not show total vindication or exoneration. *People v. Robinson*, 2020 IL 123849, ¶55," citing the same case that Houston cites in his brief for the standard applicable to an actual innocence claim. The trial court repeatedly, and properly, stated that it denied Houston's petition following the evidentiary hearing because Houston failed to present any credible witnesses to support his actual innocence claim, finding that that Willis's testimony and Paul's and Jones's affidavits were "not probable to lead to a different outcome at retrial." *Robinson*, 2020 IL 123849, ¶55. Contrary to Houston's argument, the court did not repeatedly say that the evidence was not necessarily "conclusive." Actually, the court said: "To begin with, this evidence merely adds conflicting evidence to the identification evidence presented at trial and is not necessarily conclusive. See *People* v. *Sanders,* 2016 IL 118123 ¶ 52 (finding evidence that "merely adds conflicting evidence to the evidence adduced at the trial" is not necessarily of such a conclusive character as to probably change the result on retrial and merited dismissal at the second-stage of proceedings)." See *Robinson*, 2020 IL 123849 ¶ 58 (considering conflicting evidence is proper in postconviction cases where the court is deciding whether a new trial should be granted following an evidentiary hearing.)

¶ 71     Turning to the merits of Houston's claim, the circuit court evaluated the evidence Houston presented of his actual innocence at the evidentiary hearing, along with the evidence

24

presented at trial, to determine whether the new evidence was so conclusive that it would probably change the result on retrial. The court found that Willis's testimony was "not probable to change the outcome at trial." The court found his testimony to be incredible, noting "his demeanor, responses on cross-examination and impeachment at his deposition." Specifically, the court pointed to the fact that Willis came forward 11 years after the shooting. Willis testified that he fled the scene of the shooting to avoid being struck by gun fire, "but offers little to no compelling explanation why he would not come forward the next day or any of the many days in the roughly 11 years he remained silent on the issue. Instead, Willis offers that he just remembered his witnessing the shooting after observing a flier." The court also found Willis's explanation and generic description of the shooter to be incredible, stating "he stumbled upon a flier then reached out to the family, then learned of what happened with the case, and then was more than willing to come forward-ten years after the fact-with a vague description of the shooter being white, which obviously excludes Petitioner as the shooter." The court found the timing of Willis's decision to come forward to be suspect, stating "Willis comes forward after all of these years at the same time as several other witnesses and after a white male, Petitioner's prison cellmate, had attested he was the shooter." The court stated that "[t]his similarity in timeframes and story between the various witnesses indicates much about the relationship between Willis and Petitioner and Willis' opportunity to fabricate his testimony, which ultimately indicated Willis' testimony was incredible."

¶ 72    The court then went on to find the information in Paul's affidavit was "not probable to lead to a different outcome at retrial." The court noted that Paul did not testify at the hearing "despite [his] attestation [he] would testify to the contents [of his affidavit] in front of a court" and the court had "no indication that Paul's refusal to testify would not continue if this matter

25

were to go to a new trial." Notwithstanding, the court found Paul's affidavit "merits little weight" because Paul had "intentionally not been subjected to cross-examination on the contents of his affidavit" and "refus[ed] to testify due to concerns regarding the repercussions of implicating Smith in this crime." The court drew a negative inference from Paul's absence at the evidentiary hearing and found Paul's reason for not testifying at the hearing to be "illogical and incredible," where "testifying and swearing to a statement are largely indistinguishable in the context of repercussions from a party implicated in the testimony or sworn statement." The court noted that Houston "submitted nothing but his own argument that Paul would not testify," which the court also noted "contradicts Paul's sworn statement that he was willing to testify."

¶ 73     In addition, the court found Paul's affidavit to be "largely incredible." The court stated that he had an opportunity to come forward with information while the investigation into the shooting was ongoing but did not do so at the behest of his then girlfriend, Doneisha, and for his own safety concerns. Although Paul saw Houston's father in 2008 and allegedly told him what he saw, Paul waited until 2011 to provide a sworn statement and then when questioned by the State's Attorney's conviction integrity unit, "he has amnesia." Moreover, in his affidavit, Paul stated that he agreed to provide an affidavit when he met Houston's father in 2008, but then lost his phone number and only provided the affidavit when he saw him again three years later, in 2011. Yet, Paul admitted in his affidavit that he knew that Houston's parents lived across the street from Doneisha, so his explanation for the three-year delay is incredible. The court found the 19-year delay in coming forward tended to show that Paul's testimony was incredible. The court also found that Paul's relationship with members of Houston's family to be indicative of Paul's lack of credibility.

¶ 74     The court also found Jones's affidavit "[was] not probable to lead to a difference outcome

26

at retrial" as it was "entitled to little weight." The court found that like Paul, Jones did not explain "where she went after the shooting or where she has been in the past nineteen years since the shooting or the origins of her coming forward over a decade after the shooting." She also "refused to come forward and testify at the evidentiary hearing" and her failure to testify to the contents of her affidavit is "subject to the same negative inference" and results in her affidavit being "entitled to little weight." The court stated that Jones admitted that she knew Smith "for a couple" and that "Jones' affidavit consists of the general assertion that a white male carried out this shooting and comes after Petitioner had obtained an affidavit of a white male attesting, he committed these crimes." The court also found that Jones had credibility issues because like Willis and Paul, her "affidavit comes after conversations with parties interested in the outcome of these proceedings."

¶ 75    Contrary to Houston's contention, the court did recount identification evidence presented at trial, stating: "To begin with, this evidence merely adds conflicting evidence to the identification evidence presented at trial and is not necessarily conclusive." The court then expounded:

> "At trial, the evidence showed that the shooting was carried out by someone in the
> passenger seat of the green vehicle. Willis offers that the shooter exited the vehicle. The
> trial evidence showed that Kawan was struck five times [as] approximately 7 shots were
> fired. Willis offers that two to three shots were fired from the offender who was out of the
> vehicle at the time of the shooting. Additionally, Willis is contradicted by the prior
> statements of Smith and Lampton—found to be credible instead of their inconsistent trial
> testimony. Smith and Lampton both implicated not just identified the shooter as a black
> man, but as Petitioner. The trial evidence also showed an admission of guilt by Petitioner,

his plan to flee to Indiana following the shooting, and his having actually gone to Indiana. Furthermore, Petitioner's own evidence is contradictory in that Willis' testimony is contradicted by Jones' and Paul's affidavits where they attest the shooter remained in the vehicle and shot from the passenger seat with an arm extended out of the window. Accordingly, this court finds Willis' affidavit is not probable to lead to a different outcome at a new trial."

¶ 76    After reviewing the record, we find there is nothing manifestly erroneous about the circuit court's determination that Willis's testimony was incredible and would not change the result at retrial. Notably, Willis was not credible. He testified that he "forgot all about" the shooting until he saw a poster in 2014 and instantly remembered the details of the shooting that took place 11 years earlier from about 50-60 feet away while driving 30 miles per hour. In addition, his testimony that the shooter was outside the vehicle when he shot the victim was inconsistent with other evidence adduced at trial that the shooter remained in the passenger seat during the shooting. Willis's testimony that the shooter had exited the car also contradicted Paul and Jones, who each averred in their affidavit that the shooter remained in the vehicle and shot out of the car window.

¶ 77    The circuit court's finding that Paul's and Jones's affidavits were incredible and, even if admissible on retrial, would not lead to a different outcome, was likewise not manifestly erroneous. The court was not required to take the affidavits of Paul and Jones as true at a third stage evidentiary hearing. *People v. Velasco*, 2018 IL App (1st) 161683, ¶117 (Hearsay statements in affidavits must be taken as true at stages preceding an evidentiary hearing). Paul either denied or could not remember the substance of his affidavit during his conversation with Investigator Lombard and ASA Savini, denied he ever had a girlfriend named Doneisha and

denied he knew anyone named "Twan." Nor was the information he provided newly discovered. Paul told Investigator Lombard and ASA Savini that he told Houston's father what he witnessed three months after the shooting. He also said that he spoke with Houston's attorney prior to trial and told him what he witnessed but was not asked to testify at Houston's trial. Jones told Investigator Lombard and ASA Savini that most of the information in her affidavit was not true, that the pages of the affidavit were blank when she signed them (other than the heading), that she did not know the race or gender of the shooter, that she did not see any white males at or near the scene of the shooting, and that she never knew a man named "Twan."

¶ 78    As our supreme court has noted, "the post-conviction trial judge is able to observe and hear the witnesses at the evidentiary hearing and, therefore, occupies a 'position of advantage in a search for the truth' which 'is infinitely superior to that of a tribunal where the sole guide is the printed record.' " *People v. Coleman*, 183 Ill. 2d 366, 384 (1998). The court's decision to deny Houston's actual innocence claim following the evidentiary hearing was not manifestly erroneous.

¶ 79    Houston argues that in denying his claim following the evidentiary hearing, the court placed too much emphasis on the fact that Paul and Jones did not appear in court to testify. Houston argues that affidavits are admissible at third stage evidentiary hearings and that the "circuit court's conclusion that Paul and Jones' statements should be given less weight simply because they were in the form of affidavits rather than live testimony is contrary to the statutory law governing third stage evidentiary hearings." Houston argues that he attempted to subpoena both Paul and Jones but his process server was unable to perfect service. We note that the record on appeal does not include any affidavits from the process server regarding efforts made to serve Paul and Jones with a subpoena.

¶ 80    At a third-stage evidentiary hearing, the circuit court "may receive proof by affidavits, depositions, oral testimony, or other evidence [and] * * * may order the petitioner brought before the court." 725 ILCS 5/122–6 (West 2016). However, the circuit court has wide discretion in deciding what evidence to consider (*People v. Coleman*, 206 Ill. 2d 261, 278 (2002)), and acts as the finder of fact at the evidentiary hearing, resolving any conflicts in the evidence and determining the credibility of witnesses and the weight to be given particular testimony. *People v. Domagala*, 2013 IL 113688, ¶ 34.

¶ 81    Houston relies on *People v. Molstad*, 101 Ill. 2d 128, 135-36 (1984), to support his argument that affidavits are properly accepted at a third stage evidentiary and should be afforded the same weight as live testimony. In *Molstad*, the defendant was tried with five codefendants and convicted of aggravated battery. *Id*. at 130. Molstad testified that he was not present during the attack and his parents corroborated his testimony. *Id.* at 132. None of the co-defendants, who were also convicted of the offense, testified at trial. *Id*. Molstad's counsel filed a posttrial motion to reopen the case, or, in the alternative, for a new trial, and provided affidavits from the five codefendants. *Id*. Each of the codefendants averred that Molstad was not present at the time of the attack. *Id*. Molstad contended that the evidence in the affidavits represented newly discovered evidence that was not available at the time of trial because the testimony would have violated the codefendant's fifth amendment right to avoid self-incrimination. *Id*. at 132-33.

¶ 82    Our supreme court found that the evidence presented in the affidavits was newly discovered because "no amount of diligence could have forced the codefendants to violate their fifth amendment right to avoid self-incrimination." *Id*. at 135. The court further found that the evidence was not cumulative because the testimony of the codefendants concerned an ultimate issue of the case: who was present at the time of the attack. *Id*. The court observed that

"[a]lthough Molstad offered alibi testimony at trial, the introduction of five affidavits at the posttrial stage raises additional questions concerning the trial court's verdict." *Id.*

¶ 83    Contrary to Houston's argument, *Molstad* did not hold that the circuit court must accept as true affidavits presented at a third stage evidentiary hearing. Although *Molstad* was a direct appeal, we nevertheless recognized the long-standing principle that the circuit court, as the trier or finder of fact, determines witness credibility, decides the weight to be given testimony and evidence, and resolves any evidentiary conflicts, a principle that also applies equally to the circuit court's role in postconviction evidentiary hearings. *Id*. at 133; *People v. Domagala*, 2013 IL 113688, ¶ 34. Nor did *Molstad* require the circuit court to give Paul's and Jones's affidavits the same weight it would have given their live testimony.

¶ 84    The court accepted the agreement of the parties regarding the admissibility of Paul's and Jones's affidavits. Even if Houston attempted to subpoena Paul and Jones, as the court noted, both Paul and Jones refused to testify at the hearing and there was no indication that they would appear at trial. Furthermore, there was "no basis to find that this evidence would be admissible at a new trial." As previously discussed, the court outlined several bases to support is finding that Paul's and Jones's affidavits "were not probable to change the outcome on retrial," including their overall lack of credibility, the timing and circumstances under which they came forward, and their relationships with Houston's family members. The fact that Paul and Jones refused to testify at the evidentiary hearing was only one of the reasons that the court found Paul's and Jones's affidavits failed to establish Houston's actual innocence.

¶ 85    We also agree with the court that the timing of Paul's and Jones's affidavits was highly suspect. Citing "trial strategy," Houston elected not to call Morgan, who was present in the building and available to testify at the evidentiary hearing. Morgan was the one available witness

who purportedly supported his theory that the shooter was white and not black like Houston. Morgan, who is white and coincidentally happened to be Houston's cell mate at Stateville prison, admitted to Houston and averred in an affidavit that he shot and killed the victim. Paul and Jones stated in their affidavits that the shooter was white, but their affidavits came *after* Morgan made this admission. Houston no doubt intended the Paul and Jones affidavits to lend credibility to the Morgan affidavit, yet when he had the opportunity, Houston elected not to call Morgan to testify even though he was in courthouse complex. The court recognized the shortcomings in Paul's and Jones's affidavits and found the timing of them coming forward to be another reason why Paul's and Jones's testimony would be unlikely to change the outcome.

¶ 86    After hearing all of the evidence, the circuit court, as the finder of fact, ultimately determined that Paul's and Jones's affidavits should be given little weight, which was well within the court's prerogative, where the court was tasked with resolving any conflicts in the evidence and determining the credibility of witnesses and the weight to be given particular testimony. *Domagala*, 2013 IL 113688, ¶ 34. Accordingly, we reject Houston's claim that the court placed too much emphasis on Paul's and Jones's failure to testify.

¶ 87    Accordingly, we conclude that the circuit court did not err when, following an evidentiary hearing, it denied Houston's amended postconviction petition claiming actual innocence.

¶ 88                                III.   CONCLUSION

¶ 89    Based on the foregoing, we affirm the judgment of the circuit court.

¶ 90    Affirmed.